[No. S004655. Crim. No. 24257. Dec. 7, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH BURTON LANG, JR., Defendant and Appellant.

**COUNSEL**

Richard L. Phillips, under appointment by the Supreme Court, and Michele Vague for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Edward T. Fogel, Jr.,

Assistant Attorney General, Marc E. Turchin, Thomas L. Willhite, Jr., and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUFMAN, J.**—This appeal is from a judgment of death under the 1978 death penalty law (Pen. Code, § 190.1 et seq.; all further statutory references are to this code unless otherwise indicated). Defendant Kenneth Burton Lang, Jr., was convicted by a jury of the first degree murder (§ 187) and robbery (§ 211) of Thurman Anderson. The jury found as a special circumstance that the murder was committed in the perpetration of a robbery (§ 190.2, subd. (a)(17)(i)) and it found that defendant used a firearm in the commission of each offense (§§ 1203.06, 12022.5). Defendant was also convicted of possession of a concealable firearm by a convicted felon (§ 12021).

We conclude that the conviction for possession of a concealable firearm by a convicted felon must be set aside but that otherwise the judgment should be affirmed in its entirety.

### FACTS AND PROCEEDINGS

Thurman Anderson was shot and killed on August 18, 1983, approximately one mile from the Barrel Springs campground in the Los Padres National Forest in an area where he had told his wife he would be hunting deer. In pretrial statements to law enforcement officers, and in his testimony at trial, defendant admitted he had killed Anderson but claimed he had acted in self-defense.

*The Prosecution's Case*

Daniel Crothers became acquainted with defendant in Portland, Oregon, during the summer of 1983. On five or six occasions Crothers observed defendant carrying a handgun in a coat pocket or stuffed down his pants. When Crothers asked defendant, whom he knew as "Shilo," why he had the gun, defendant pointed the weapon at Crothers and said, "I'll waste any mother fucker that screws with me."

Steve Schroff met defendant when they both worked on a construction project in Atascadero during the summer of 1982. In early August of 1983 defendant telephoned Schroff and announced he was coming to California

for a visit. Schroff saw defendant in Atascadero on August 15, 1983. Defendant was carrying a knapsack and a radio and Schroff was under the impression defendant had been hitchhiking. Defendant left the next day, saying he was going "down south." Defendant told Schroff he had a .32-caliber revolver for protection.

On Thursday, August 18, Thurman Anderson left his home in Camarillo at approximately 12:45 p.m. to go deer hunting. Anderson was driving an undamaged motor home. He told his wife he would return by August 21. She knew he planned to camp at Barrel Springs and to hunt across the stream from the campground area on a rolling mountain or ridge. They had visited the area in June and Anderson's wife had assisted in preparing a map showing the route from Highway 101 to the campground. According to his wife, Anderson was not in the habit of picking up hitchhikers.

At approximately 8:45 p.m. on August 18, Anderson's motor home was stopped by an officer of the California Highway Patrol because the taillights were not working. The stop occurred on Highway 101 in Atascadero. Defendant, the driver and sole occupant of the vehicle, gave his name as Kenneth Burton Stevens. Defendant said that he had no identification and that the motor home belonged to his stepfather. Defendant did not seem at all evasive or nervous.

Still driving the motor home, defendant arrived at Steve Schroff's house in Atascadero at approximately 6 p.m. the next day. Defendant told Schroff the motor home belonged to a hunter who had hired defendant as a chauffeur. Defendant said he wanted to "go out and party; just have a good time." Accompanied by Schroff's girlfriend, Terry Davis, defendant and Schroff drove to a truck stop where Schroff arranged for defendant to get $13 worth of gas and $87 cash with Anderson's credit card. Defendant signed Anderson's name on the receipt.

While in the motor home, Davis observed defendant remove a rifle from its case and show it to Schroff. She also saw defendant remove a handgun from under his seat. Defendant said, "Mr. Schroff, would you like to check out this gun?" Pointing the gun at Schroff and Davis, defendant said, "bang, bang" and laughed. Defendant drove to a motel where he had apparently rented a room. Defendant gave the room key to Schroff and told him he could stay in the room with Davis while defendant spent the night in the motor home.

After leaving Schroff and Davis at the motel, defendant went to a restaurant, arriving about 10 p.m. Defendant found an acquaintance named Mitchell Bass and they drank beer and talked for about an hour. Defendant

said he wanted to drive around and party. Defendant and Bass walked to a bar nearby where Bass saw a woman he knew named Ines Tinker, who agreed to join them. Defendant drove Bass and Tinker in the motor home. After purchasing beer, defendant parked on a hill and the three sat around drinking and talking. Bass did not think that defendant seemed particularly despondent or depressed on this occasion. When Bass asked how defendant had acquired the motor home, defendant said his boss allowed him to use it on weekends. Defendant showed Bass a rifle and a handgun and pointed the handgun at Bass. Defendant fell asleep and was awakened about 6 a.m. by Bass. After driving Tinker and Bass to their homes, defendant drove back to the motel and fell asleep in the motor home. He was awakened by Schroff at approximately 8 a.m. and drove Schroff and Davis to their respective places of employment. Schroff next saw defendant later that day after Schroff had returned home from work. Defendant said he was going by airplane to San Francisco and would leave the motor home at the airport. Defendant gave Schroff the rifle and binoculars that were in the motor home. When Schroff asked about this, defendant told Schroff not to worry, that it was "all under control," and that he "took care of it." Defendant seemed "a little jumpy" and frequently looked in the rearview mirror while driving. Defendant again used Anderson's credit card to purchase gasoline for the motor home.

Defendant was taken into custody at the San Francisco airport about 9 p.m. that evening after attempting to carry a bag containing a loaded .32-caliber revolver through a security station equipped with an X-ray screening device. Defendant said the bag belonged to his brother and he (defendant) did not know what was in it. Defendant gave his name as Thurman Anderson. Although he initially denied carrying identification, he eventually produced a wallet containing Anderson's credit card and driver's license extension (defendant had discarded the license itself, which bore Anderson's photograph).

After being transported to a nearby substation, defendant gave a birth date of January 27, 1960, and said he lived in Cazadero, which is in Sonoma County. When a computer check of Anderson's driver's license number indicated a 20-year disparity in birth dates, defendant said he was Thurman Anderson's son. The bag in which the revolver was found also held an airplane ticket to Seattle, purchased by defendant, and certain personal effects which Anderson and his wife had stored in the motor home.

On August 24, Santa Barbara police found Anderson's motor home, which now had some external damage, in the parking lot of the San Luis Obispo airport. Anderson's body was found by the police on August 26. The body was face down, with the hands under the chest, in a grove of trees in a very remote area, with an animal trail but no human trail nearby. There

were no weapons or binoculars on the body. Anderson's belt was unbuckled and the top button of the pants was undone. Although Anderson normally wore a knife in a sheath on his belt when hunting, there was no knife or cartridge case on the belt and the pants pockets were empty. The immediate area was carefully searched but no shell casings, weapons, wallet, or other personal effects were found.

Anderson had been shot five times. One bullet had entered the chest, travelling horizontally at a 45-degree angle to the body's left side, and penetrated the heart. Three bullets entered behind the left ear and another in the back. Although the precise sequence of the shots could not be determined, it was likely that Anderson was first shot in the chest while standing. This shot would have caused an immediate drop in blood pressure, with loss of consciousness within five to fifteen seconds, although attempts to breathe while unconscious would have produced gurgling sounds for a few minutes. Anderson bled to death very rapidly from the wound to his heart. The remaining shots were most likely fired while Anderson was lying unconscious.

Bullets recovered from the body were consistent with bullets test-fired from the weapon recovered from defendant, although the bullets were too deformed to permit positive identification.

*The Defense Case*

An employee of the United States Forest Service testified that no one was at the Barrel Springs campground on Friday, August 19, but that the campground was about half full during that weekend. In the area there were numerous cattle trails also used by deer. The spot where Anderson's body was found was a better than average location to hunt deer and was one to one and one-half miles from the campground, requiring a walk of approximately forty minutes.

Testifying in his own behalf, defendant stated that after leaving Atascadero on a Wednesday he hitchhiked to Santa Monica, looking for work. The same evening he decided to return to Atascadero. By noon the next day he had hitchhiked to Santa Barbara. It was raining. Defendant accepted a ride from Anderson, who was driving a motor home. Anderson introduced himself as "Andy."[1] Defendant said he was going to Atascadero. Anderson said he was going hunting for a day or two and suggested that defendant join him. Defendant agreed. They stopped at a store on Highway 154.

---

[1] Anderson's wife testified that Anderson was called Andy at work but that he disliked the nickname and would not introduce himself by that name.

Anderson gave defendant $100 and defendant bought food and beer. Defendant drank beer as Anderson drove to the Barrel Springs campground.

When they reached the campground they leveled the motor home and started setting up camp. By this time defendant had consumed seven or eight beers. At Anderson's suggestion they walked about a quarter mile to a water hole, intending to swim and bathe, but upon seeing how deep the water was they returned to the campground and after further discussion decided to go hunting. Anderson took his 30.06 hunting rifle and strapped a knife on his belt. At Anderson's request, defendant carried Anderson's binoculars and another hunting knife. Defendant also carried his own handgun, which was loaded. At defendant's request, Anderson did not load his rifle. Anderson carried ammunition in a cartridge case on his belt.

After they had been hiking for about 45 minutes Anderson said something about being afraid of catching venereal disease and having had sex with two males before. Defendant ignored these remarks. As defendant was looking through the binoculars, Anderson approached him from the rear and attempted to grab defendant by the leg and to kiss him. Defendant pushed Anderson away and yelled angrily at him. Anderson turned his back to defendant and swung the rifle down from his shoulder. Defendant could not see Anderson's hands and thought Anderson was loading the rifle. As Anderson slowly turned toward defendant, defendant pulled the handgun from his belt and fired. Although he emptied the gun, defendant could not recall actually firing beyond the first shot.

Anderson was lying on the ground and appeared to be seriously injured. For his own safety, defendant took the rifle, knife, and cartridge case. He also took the motor home keys. Defendant ran from the scene and returned to the campground. He left in the motor home. Driving recklessly, defendant hit a tree, damaging the rear part of the motor home. He was still frightened when he was stopped by the highway patrolman near Atascadero.

Defendant later discovered Anderson's wallet and watch in the motor home. He used Anderson's credit card to make three purchases at gas stations, pay for a motel room, buy airline tickets from San Luis Obispo to Seattle, and purchase a small amount of goods. Five days after being arrested in San Francisco on a weapons possession charge, defendant spoke to officers investigating Anderson's disappearance. Defendant told the officers a series of lies, including that he had taken the motor home when it had been left running outside a store, and that he had found the handgun in the motor home. Under further questioning, defendant eventually admitted

shooting Anderson, described the circumstances in a manner generally consistent with his trial testimony, and led the officers to the body.

During cross-examination defendant was asked about his attitude toward homosexuals. Defendant stated that although he did not dislike homosexuals, he did not like it if a homosexual tried to "play on" him. Defendant denied frequenting an area in downtown Portland called "The Camp," known as a pickup area for homosexuals, or seeing a man named Donnie Marshall there. Defendant admitted previous felony convictions in Oregon for burglary, robbery, forgery, escape, and unauthorized use of a motor vehicle.

Dr. Rex Beaber, a clinical and forensic psychologist, had interviewed defendant and reviewed a transcript of defendant's statements to law enforcement officers shortly after his arrest. Beaber testified that Anderson's stated fear of venereal disease, as related by defendant, suggested he might belong to a subgroup of male homosexuals having very few sexual contacts with men and an almost morbid preoccupation with venereal disease. According to Beaber, this subgroup's existence is not generally known. Beaber further testified that defendant's account of his actions following Anderson's death was consistent with a panic reaction alternating with a fatalistic outlook in which defendant believed he would inevitably be caught and these were his last days as a free man.

*Rebuttal*

Donnie Marshall, a homosexual with a preference for younger men, saw defendant seven or eight times during the summer of 1983 in areas of downtown Portland known as pickup spots for male homosexuals. Defendant was carrying a handgun when Marshall first met him. During a later meeting Marshall agreed to accept defendant as a roommate. When Marshall asked if he could orally copulate defendant, defendant did not seem in any way disturbed by the proposition.

Dr. Lee Coleman, a psychiatrist, testified to the unreliability of the opinions of psychiatrists and psychologists concerning disputed questions of fact, including an individual's state of mind. Coleman found nothing unusual or significant in Anderson's alleged statement about a concern regarding venereal disease. Defendant's claimed loss of memory regarding every shot after the first was inconsistent with Coleman's knowledge of genuine cases of amnesia.

*Penalty Phase*

A stipulation was read to the jury stating that defendant had been convicted in Oregon of second degree burglary, second degree robbery, forgery,

unauthorized use of a motor vehicle, and second degree escape. In addition, it was stipulated that the escape conviction was based on defendant's having walked away from a work detail outside the Oregon State Correctional Institution and that he had given up without resistance when confronted by a police officer near his hometown. A Santa Barbara County correctional officer testified as a defense witness that defendant had not been involved in any disciplinary problems during the 14 months he had been housed in the Santa Barbara County jail.

## GUILT AND SPECIAL CIRCUMSTANCE ISSUES

### I. *Impeachment With Prior Felony Convictions*

Defendant contends that the trial court erred in denying his motion under Evidence Code section 352[2] to preclude impeachment with prior felony convictions. He argues that his prior conviction for escape was, as a matter of law, inadmissible for impeachment, and that the trial court erred in failing to exercise discretion under Evidence Code section 352 in ruling on the motion. The error in allowing impeachment was prejudicial, defendant argues, because his five prior convictions were exploited by the prosecutor during argument to the jury when the prosecutor referred to defendant as a "gangster," and because his prior conviction for robbery involved the same offense charged against defendant in this proceeding.

After the prosecution had rested its case-in-chief but before any defense evidence had been presented, defense counsel moved under Evidence Code section 352 to preclude impeachment with prior felony convictions. Counsel stated that defendant had prior felony convictions in Oregon for second degree burglary, forgery, and robbery. Counsel conceded that defendant could be impeached with the burglary and forgery convictions but objected to impeachment with the robbery conviction. The prosecutor replied that defendant had five prior felony convictions, the three noted by defense counsel and also escape and grand theft auto. Citing article I, section 28, subdivision (f), of the California Constitution (hereafter section 28(f)),[3] the prosecutor argued that defendant could be impeached with all five convictions. Defense counsel then stated he was unaware of a grand theft auto

---

[2] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

[3] Section 28(f) provides: "Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding. When a prior felony conviction is an element of any felony offense, it shall be proven to the trier of fact in open court."

conviction and believed defendant had been convicted of a lesser charge. Regarding the escape conviction, counsel argued it was irrelevant for impeachment purposes.

The trial court denied the motion to preclude impeachment with prior felony convictions. When defendant testified, his counsel immediately elicited his admission of five prior felony convictions: robbery, second degree burglary, forgery, escape, and unauthorized use of a vehicle.

The offenses charged against defendant in this proceeding were committed after adoption of section 28(f) as part of Proposition 8 on the June 1982 Primary Election ballot, and they were tried before this court's decision in *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111]. The trial court's ruling is thus subject to a presumption, not dispelled by the record, that the court failed to exercise its discretion under Evidence Code section 352 to control the use of prior felony convictions for impeachment. (See *People* v. *Collins* (1986) 42 Cal.3d 378, 389, fn. 9 [228 Cal.Rptr. 899, 722 P.2d 173].)

In addressing the issues raised by defendant, the first step is to decide "whether the prior convictions are (1) admissible or excludable in the trial court's discretion or (2) inadmissible as a matter of law." (*Collins, supra,* 42 Cal.3d at p. 389.) ■ A conviction is inadmissible as a matter of law if its least adjudicated elements do not necessarily involve moral turpitude.[4] (*Castro, supra,* 38 Cal.3d at p. 317.) In this context, moral turpitude means a "readiness to do evil" or a "moral depravity of any kind." (*Id.* at pp. 314, 315.) Of the five prior convictions at issue, only the escape conviction is asserted by defendant not to involve moral turpitude. Because the issue is raised by the dissent, however, we also consider whether the crime of unauthorized use of a vehicle is a crime involving moral turpitude.

■ The crime of escape without force, as defined in subdivision (b) of section 4532,[5] was held to be a crime of moral turpitude in *People* v. *Wal-*

---

[4] Other grounds for holding a prior felony conviction inadmissible as a matter of law are that it would be an abuse of discretion under Evidence Code section 352 to permit its use for impeachment and that the conviction has lost felony status by operation of law. (*Collins, supra,* 42 Cal.3d at pp. 389-390.) We do not here consider either of these grounds as neither has been placed in issue by defendant.

[5] "Every prisoner arrested and booked for, charged with, or convicted of a felony who is confined in any county or city jail or prison or industrial farm or industrial road camp or who is engaged on any county road or other county work or who is in the lawful custody of any officer or person, or who is confined pursuant to Section 4011.9, who escapes or attempts to escape from such county or city jail, prison, industrial farm or industrial road camp or from the custody of the officer or person in charge of him or her while engaged in or going to or returning from such county work or from the custody of any officer or person in whose lawful custody he or she is, or from confinement pursuant to Section 4011.9, is guilty of a felony

*decker* (1987) 195 Cal.App.3d 1152, 1158 [241 Cal.Rptr. 650]. As noted in that decision, escape without force or violence necessarily involves either deceit, breach of trust, or stealth to effectuate the escape and a willingness to incur the serious risk of violent injury to law enforcement officers and bystanders typically involved in the process of recapturing an escaped prisoner. We agree with the reasoning of *Waldecker* and hold that escape *without force is a crime necessarily involving moral turpitude.*

Defendant was convicted under the provisions of Oregon Revised Statutes section 162.155 stating that a person commits escape if "(b) Having been convicted or found guilty of a felony, the person escapes from custody imposed as a result thereof" or "(c) the person escapes from a correctional facility; or while otherwise under the jurisdiction of the Psychiatric Security Review Board, the person departs from this state without authorization of the board." This provision applies to a person placed in a work release facility who fails to return to the facility when his job is concluded for the day. (*Kneefe* v. *Sullivan* (1970) 2 Ore.App. 152 [465 P.2d 741].) Defendant maintains that such conduct involves little or no deceit and poses little or no risk of violence. We disagree. Escape without force, as defined by both Oregon and California law, necessarily involves some form of stealth, deceit, or breach of trust, and the potential for violence is always present when an escaped felon is recaptured. Accordingly, the holding of *Waldecker, supra,* 195 Cal.App.3d 1152, applies to defendant's conviction for escape as defined by Oregon law.

Before determining whether the Oregon offense of unauthorized vehicle use is a crime of moral turpitude, it is necessary to address respondent's argument that any issue regarding impeachment with this prior conviction must be deemed waived for failure to expressly raise it in the trial court. As the record shows, defense counsel proposed that impeachment be limited to the prior convictions for forgery and burglary. During the discussion a dispute arose as to whether defendant's other prior convictions included one for grand theft auto or some lesser offense. Before this dispute was resolved, the trial court denied the motion, expressing the view that section 28(f) had deprived it of discretion to exclude any prior conviction for impeachment. While it would have been better practice for defense counsel to have stated for the record that defendant's objection included the unauthorized-vehicle-use conviction, the scope of the objection is readily inferable and the formal statement was not required to preserve the issue for review.

■ Under Oregon law, "A person commits the crime of unauthorized use of a vehicle when: [¶] (a) The person takes, operates, exercises control

---

and, if such escape or attempt to escape was not by force or violence, is punishable by imprisonment in the state prison for 16 months, or two or three years to be served consecutively, or in the county jail not exceeding one year . . . ." (§ 4532, subd. (b).)

over, rides in or otherwise uses another's vehicle . . . without consent of the owner . . . ." (Ore.Rev.Stat. § 164.135.) This provision has been construed to require "that the actor manifest an intent to deprive the rightful possessor of possession or to otherwise interfere with the rightful possessor's use of the vehicle . . . ." (*State* v. *Douthitt* (1978) 33 Ore.App. 333 [576 P.2d 1262, 1265].) For present purposes, the offense thus defined does not differ significantly from unlawful driving or taking of a motor vehicle (Veh. Code, § 10851), a California offense uniformly held to involve moral turpitude (*People* v. *Rodriguez* (1986) 177 Cal.App.3d 174, 178 [222 Cal.Rptr. 809], and cases there cited). We conclude that unauthorized vehicle use (Ore.Rev.Stat. § 164.135) is likewise an offense necessarily involving moral turpitude.

■ As defendant's prior felony convictions were admissible or excludable in the trial court's discretion for purposes of impeachment, the trial court's error consisted only in its failure to exercise discretion. As defendant did testify, we begin the process of assessing prejudice by making "a preliminary determination of the probable effect of the prior convictions, taken together, on the outcome of the trial." (*Collins, supra,* 42 Cal.3d at p. 390.) The error may be deemed harmless if we conclude it is "reasonably probable that a result more favorable to the defendant would *not* have been reached in the absence of the *Castro* error—i.e., that the admission of the prior convictions did not change the outcome . . . ." (*Id.* at p. 391, italics in original.) If we are unable to reach this conclusion, reversal of the judgment will be required for the limited purpose of remanding the cause to the trial court with directions to exercise its discretion in the matter. (*Ibid.*)

Undertaking this analysis, we note that the prosecution presented a very strong case. It was undisputed that defendant killed Anderson. Proof that robbery was the motive for the killing included the remote location of the shooting, defendant's ownership and possession of the murder weapon, Anderson's having been shot five times (including three tightly clustered shots behind the left ear), the removal of items from Anderson's body (including his keys and the cartridge case and knife sheath taken from Anderson's belt), defendant's continued possession of Anderson's property (including his wallet) up to the time of his arrest, and defendant's flight and initial falsehoods.

The account of the killing given by defendant in his testimony—i.e., that Anderson made a threatening motion with the rifle, that defendant was in fear of his life when he fired the fatal shots, and that the intent to take Anderson's property was formed only after Anderson's death—was not corroborated by any other evidence and failed utterly to plausibly explain why defendant shot Anderson five times and why defendant then carefully

removed Anderson's possessions before returning to the motor home. Defendant's testimony that it was at his request that Anderson did not load the rifle, while defendant all along carried a loaded handgun, provided compelling evidence that defendant had formed the intent to commit robbery before leaving the campground.

Defendant argues that his explanation of how he and Anderson reached the scene of the shootings was credible and consistent with the physical evidence and that the robbery motive was implausible because he made relatively little use of Anderson's property. These arguments are unpersuasive. The plausibility of defendant's description of some events in no way implies his innocence or establishes the credibility of other portions of his testimony. The jury may well have concluded that Anderson went voluntarily to the scene of the shooting and that defendant's narrative up to this point was more or less accurate. The other evidence previously noted would nonetheless inevitably lead a reasonable jury to conclude that defendant had previously formed the intent to rob Anderson and had waited until this opportune moment, when Anderson was in a remote area and the risk of observation or interruption was virtually nil, to carry out his plan. Defendant's failure to make greater use of Anderson's property is hardly a point in defendant's favor. Defendant was far from home and did not have a vehicle of his own. Knowing that Anderson would certainly be missed, he could not continue driving Anderson's vehicle indefinitely and he lacked the means to transport or convert to cash large items such as the rifle or the motor home's tape player and refrigerator. That defendant appropriated "only" Anderson's wallet, credit cards, and personal effects, after using the motor home for three days and giving away the rifle and binoculars, does not persuasively show he lacked intent to rob when he shot Anderson.

The admission of the three prior convictions for impeachment could not have significantly affected the jury's assessment of defendant's credibility because, even without those priors, his credibility was about as suspect as it could possibly have been. Defendant conceded he was properly impeached with two prior felony convictions and admitted during his testimony that he had lied repeatedly about his own identity and about how he came into possession of Anderson's property.

Defendant argues that the three challenged priors were prejudicial because they implied he was a thoroughly bad person with a propensity to commit the very crimes charged. But the portrait of defendant as a "gangster" would have been almost as vivid even if the court had excluded evidence of the prior robbery, unauthorized vehicle use, and escape convictions. The jury would have learned in any event of defendant's prior convictions for forgery and burglary, and there was undisputed evidence that

defendant commonly carried a handgun on his person, had made liberal use of Anderson's property after his death, and showed no concern or remorse regarding the shooting. We conclude it is reasonably probable that admission of the three challenged prior convictions did not change the outcome of the trial, and so the error in failing to exercise discretion was harmless. (*Collins, supra,* 42 Cal.3d at p. 391.)

## II. *Alleged Character Evidence*

Defendant contends that certain testimony adduced by the prosecution over his counsel's objection should have been excluded as irrelevant, as inadmissible character evidence, and because any probative value it may have had was outweighed by the risk of undue prejudice to defendant. The evidence thus challenged includes virtually all testimony of Daniel Crothers and Donnie Marshall, and those portions of the testimony of Steven Schroff, Terry Davis, and Mitchell Bass stating that defendant pointed his handgun at them in an apparently joking manner. Defendant also contends the trial court erred in failing to instruct the jury sua sponte on the limited admissibility of this evidence.

*Testimony of Daniel Crothers*

During jury selection, the trial court conducted a hearing on the prosecution's motion *in limine* to determine the admissibility of testimony by proposed prosecution witness Daniel Crothers. ▮▮▮ After the hearing, at which Crothers testified, the trial court sustained defense objections to some of Crothers's proposed testimony, but overruled objections to testimony that Crothers had observed defendant carrying a handgun on five or six occasions during the summer of 1983 and that when he asked why defendant carried the gun, defendant pointed the weapon at him and replied, "I'll waste any mother fucker that screws with me." Relying on Evidence Code sections 1101,[6] 350,[7] and 352, defendant contends it was error to admit this testimony.

---

[6] "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such acts. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." (Evid. Code, § 1101.)

[7] "No evidence is admissible except relevant evidence." (Evid. Code, § 350.)

In *People* v. *Rodriguez* (1986) 42 Cal.3d 730 [230 Cal.Rptr. 667, 726 P.2d 113], we rejected a similar contention regarding admissibility of the defendant's statements that he would kill any police officer who tried to arrest him. Noting that a defendant's threat against the victim is relevant to prove intent in a prosecution for murder, and that a generic threat is admissible to show the defendant's homicidal intent where other evidence brings the actual victim within the scope of the threat, we concluded that the statements were relevant and not excludable under Evidence Code section 1101. (*Rodriguez, supra,* at pp. 756-757.) We also rejected an argument under Evidence Code section 352, observing that the evidence was probative of an essential element of the prosecution's case and not cumulative. (42 Cal.3d at pp. 757-758.)

A defendant's statements that "he would kill anyone who got in the way of his plan" were likewise found to have been properly received in evidence in a prosecution for capital murder. (*People* v. *Thompson* (1988) 45 Cal.3d 86, 109-110 [246 Cal.Rptr. 245, 753 P.2d 37].) Although the prosecution presented no direct evidence that the victim had attempted to thwart defendant's plan, and thus was within the scope of the threat, the evidence was admissible to provide a possible motive in a case where no other motive for the killing was apparent. (*Ibid.*)

In a third decision, we held admissible, under the state-of-mind exception to the hearsay rule (Evid. Code, § 1250),[8] a defendant's statement "that he would not hesitate to eliminate witnesses if he committed a crime." (*People* v. *Karis* (1988) 46 Cal.3d 612, 634-638 [250 Cal.Rptr. 659, 758 P.2d 1189].) Although we rejected an argument that the statement was barred by Evidence Code section 1101, we cautioned that "the content of and circumstances in which such statements are made must be carefully examined both in determining whether the statements fall within the state-of-mind exception, as circumstantial evidence that defendant acted in accordance with his stated intent, and in assessing whether the probative value of the evidence outweighs that potential prejudicial effect." (46 Cal.3d at p. 636.) We concluded that evidence of a generic threat is admissible to prove the declarant's state of mind "unless the circumstances in which the statements were made, the lapse of time, or other evidence suggests that the state of mind

---

[8] "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2) The evidence is offered to prove or explain acts or conduct of the declarant.

"(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed." (Evid. Code, § 1250.)

was transitory and no longer existed at the time of the charged offense." (*Id.* at p. 637.)

Here the statement was made approximately one month before the charged offenses to explain why defendant carried a handgun. Defendant continued to carry the same gun throughout this one-month period and there were no circumstances indicating that the state of mind demonstrated by the statement had ceased to exist by the time of the charged offenses, which were committed with the same gun.

In ruling on the motion *in limine,* the court was necessarily forced to rely on the representations of the parties regarding what issues would be disputed during the trial. Both parties recognized that defendant was charged with first degree murder on both felony-murder and premeditation theories, that defendant's identity as the killer would not be disputed, and that self-defense would be in issue. In accordance with this understanding, the jury was "preinstructed," before any evidence was presented, on self-defense, both first degree murder theories (i.e., premeditation and felony-murder), and on various lesser included offenses. Although the prosecutor in closing argument conceded there was insufficient evidence to support the premeditation theory, that theory remained in issue throughout the trial and was again covered in the instructions given at the close of the guilt phase. In addition, the robbery-murder special circumstance, because the trial was held after our decision in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], but before our decision in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], placed intent to kill at issue, and the jury was so instructed.

The jury could reasonably interpret defendant's statement ("I'll waste any mother fucker that screws with me.") to mean he had a preexisting intent to kill anyone who interfered with him or thwarted his desires or plans or, in other words, to kill on slight provocation under circumstances where he had no right of self-defense. Crothers's testimony thus provided circumstantial evidence that the killing of Anderson was intentional and was not required for self-defense. Under defendant's version of the killing, which the trial judge considered in ruling on the motion, Anderson was interfering with defendant by making a sexual advance and by making gestures with a rifle which defendant knew to be unloaded. Crothers's testimony supported an inference that defendant responded to Anderson's conduct with deadly force even though defendant realized he was not in imminent danger of death or great bodily injury. If the jury determined from other evidence presented, as it eventually did, that defendant killed in the course of a robbery, Crothers's testimony provided evidence that the killing was intentional rather than accidental or in response to a threat of

deadly force by the robbery victim. Crothers's testimony supported an inference that defendant had a preexisting intent to use deadly force to overcome any perceived resistance (like a gesture with an unloaded rifle) by a robbery victim or to prevent the victim from interfering with defendant by reporting the robbery and becoming a prosecution witness. Because the evidence was relevant to prove intent to kill, and to defeat the claim of self-defense, it was not made inadmissible by Evidence Code section 350, nor, for the reasons noted, was it barred by Evidence Code section 1101.[9]

Before completing the weighing process required by Evidence Code section 352, the court inquired what other evidence the prosecution would be presenting to counter the claim of self-defense. In reply the prosecutor mentioned the position of the gunshot wounds (particularly the three behind Anderson's ear), the stronger-than-normal trigger pull of defendant's handgun, and defendant's possession of Anderson's belongings, as indicating that defendant did not kill Anderson in self-defense. In ruling Crothers's testimony admissible under Evidence Code section 352, the court noted that it would be "not merely cumulative," that the undue prejudice would be "quite slight," and that the probative value was "considerable."

Because the prosecution intended to offer other evidence which would tend to prove the same facts, Crothers's testimony was cumulative. ▮ But trial courts are not required to exclude all cumulative evidence and if evidence has substantial relevance to prove material facts which are hotly contested and central to the case, it is not "merely cumulative." (See *People v. Thompson, supra,* 45 Cal.3d 86, 115-116; *People v. Anderson, supra,* 43 Cal.3d 1104, 1137.) ▮ And while Crothers's testimony portrayed defendant as a dangerous person inclined to violence, the trial court was not obliged for this reason to exclude it. (See *Karis, supra,* 46 Cal.3d 612, 637-638.) The record indicates the trial court carefully weighed the risk of undue prejudice against the probative value of the evidence on the issues of intent to kill and self-defense. We conclude the trial court did not abuse its discretion under Evidence Code section 352.

*Testimony of Donnie Marshall*

▮ In rebuttal, Donnie Marshall testified, over defense objection, that he had solicited defendant to perform an act of oral copulation and that defendant had displayed no anger at the proposition. He also testified he

---

[9] This conclusion makes it unnecessary to decide whether the limitations of Evidence Code section 1101 continue to apply to the prosecution of crimes committed after enactment of article I, section 28, subdivision (d), of the California Constitution, the "Right to Truth-in-Evidence" provision of Proposition 8. (See *People v. Harris* (1989) 47 Cal.3d 1047, 1081 [255 Cal.Rptr. 352, 767 P.2d 619].)

had seen defendant on several occasions in areas of Portland frequented by homosexuals. Defendant now contends that this evidence should have been excluded as irrelevant, as violating the rule against impeachment on collateral matters, as improper character evidence, and because its probative value was substantially outweighed by the risk of undue prejudice.

Evidence tending to contradict any part of a witness's testimony is relevant for purposes of impeachment. (Evid. Code, § 780, subd. (i); *People* v. *Lavergne* (1971) 4 Cal.3d 735, 742 [94 Cal.Rptr. 405, 484 P.2d 77].) Defendant testified that Anderson's statements concerning homosexual conduct made him angry, that he dislikes having such remarks directed to him, and that he told a police investigator he "started getting madder and madder [upon hearing Anderson's statements], because he was starting to talk all that crap." Evidence that defendant had received a sexual proposition from Marshall without showing any annoyance tended to contradict this testimony and thus was relevant for impeachment.

Marshall's testimony did not violate the rule against impeachment on collateral matters. (See *People* v. *Thompson, supra,* 45 Cal.3d 86, 110; *People* v. *Lavergne, supra,* 4 Cal.3d 735, 742-744.) Defendant's mental state during the moments immediately preceding the shooting was not a collateral matter; it was of critical importance in regard to several issues, including "heat of passion" as an element of voluntary manslaughter, one of the lesser included offenses on which the jury was instructed. The prosecutor's questions regarding defendant's alleged anger and the reasons for it were proper to probe defendant's mental state immediately before the shooting and to demonstrate the implausibility of his testimony.

As noted above, Marshall's testimony was proper impeachment evidence and was not admitted to prove defendant's character or disposition. Accordingly, Marshall's testimony was not made inadmissible by Evidence Code section 1101.[10] Defendant argues, however, that this evidence, because of its tendency to degrade his character, should have been excluded under Evidence Code section 352 (see fn. 2, *ante*). The jury would likely reason, defendant maintains, that because defendant was seen by Marshall in areas frequented by homosexuals and also known for drug dealing and theft offenses, defendant was probably himself a homosexual, a drug user, and a thief.

Defendant himself placed in issue his knowledge of homosexual behavior patterns by offering the testimony of Dr. Beaber that the remarks defendant

---

[10] The limitations of Evidence Code sections 786 and 787, on which defendant also relies, do not apply in this case as the charged crimes were committed after enactment of article I, section 28, subdivision (d), of the California Constitution. (See *People* v. *Harris, supra,* 47 Cal.3d 1047, 1081-1082.)

attributed to Anderson were characteristic of a subgroup of homosexuals and that this distinctive behavior was not widely known. The prosecutor could properly respond to this testimony by showing that defendant had been seen in areas frequented by homosexuals and thus could have acquired knowledge of particular behavior patterns through experiences in these areas, including contacts with persons like Marshall. That these same areas were also the site of drug and property offenses was irrelevant, but the testimony on this point was not part of the offer of proof and was volunteered by the witness. As defendant did not make a timely and specific objection or move to strike this particular testimony, the issue is not reviewable on appeal. (Evid. Code, § 353; *People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048].)

In response to defendant's motion under Evidence Code section 352, the trial court carefully weighed the probative value of Marshall's testimony, as represented in the offer of proof, against the risk of undue prejudice to defendant. The trial court in fact excluded evidence that defendant had accepted Marshall's proposition and had been orally copulated by Marshall. We find no abuse of discretion in the trial court's ruling to admit the balance of Marshall's testimony.

*Testimony Concerning Postoffense Weapon Use*

■ Prosecution witnesses Schroff, Davis, and Bass testified that defendant pointed a handgun or rifle at them in a joking manner. Davis testified, in addition, that defendant said, "bang, bang," and laughed wickedly as he pointed his handgun at her. According to the testimony, these incidents occurred while defendant was in possession of Anderson's motor home and thus within a day or two following Anderson's killing.

Before these witnesses testified, a hearing was held on defendant's motion to exclude their anticipated testimony.[11] The motion's grounds were that the evidence was irrelevant, that it was offered to prove criminal disposition or character, and that under Evidence Code section 352 any probative value was outweighed by the risk of undue prejudice. Arguing that the evidence was relevant to show defendant's state of mind following the killing, the prosecutor stated: "People are submitting that [defense] counsel's painted a picture of his client as being a man saddened and wants to drink and sad because of this homosexual panic, a need of self-defense, and he had to shoot the man, and as an afterthought decided to take his property." The prosecutor further argued that evidence would be offered "to show the state

---

[11] According to an offer of proof, Bass would have testified that defendant said, "this is a stick-up" and laughed as he pointed the rifle at Bass. The trial court sustained defendant's objection to this proposed testimony.

of mind this man has at that time, not one of remorse or sadness but of a cavalier attitude about executing someone. That it wasn't a question of crime of panic. That it wasn't in self-defense." Defense counsel argued in response that defendant's remorse or lack thereof on August 19th or August 20th was not relevant to his state of mind at the time of the killing on August 18th. The prosecutor then noted that the evidence also showed defendant's reckless manner with firearms. The trial court overruled the objection, stating that "the fact that he [defendant] carried a loaded weapon and was cavalier with the way he handled it is relevant to how he conducted himself with firearms in this case."

That defendant was cavalier or reckless in his handling of firearms does not appear relevant to any issue in this case. A theory that Anderson's death was caused by defendant's careless handling of firearms would be inconsistent with both prosecution and defense positions. In addition, any possibility the killing was accidental and caused by carelessness was virtually eliminated by evidence of the number and position of the victim's wounds, and evidence that the force required to pull the trigger on defendant's handgun was approximately double that required for the average handgun.

On the other hand, the prosecutor was correct in arguing that defendant's state of mind after the killing could be relevant in determining how the killing occurred. Indeed, defendant's state of mind following the killing was explicitly placed in issue by Dr. Beaber's testimony that defendant's conduct during this time was consistent with a mental state alternating between panic and fatalism, a mental state more likely, the defense argued, to follow a killing in self-defense than a premeditated murder. Evidence of post-offense conduct by defendant arguably inconsistent with both panic and fatalism was admissible to rebut Dr. Beaber's testimony.

When the admissibility of the gun-use evidence was considered, Dr. Beaber had not yet testified and the issue presented was admissibility of the evidence for the prosecution's case-in-chief rather than in rebuttal. However, when the prosecutor argued, in essence, that the evidence would contradict defendant's own statements about his postoffense state of mind, defense counsel did not object that the prosecutor had mischaracterized the nature of the defense or that the prosecutor's theory of admissibility constituted an improper anticipation of defense evidence. (See Evid. Code, § 353 [motion to exclude evidence must clearly state the specific ground of objection].) Instead, defense counsel argued only that defendant's state of mind a day or two after the shooting was not relevant to prove his intent at the time of the shooting.

At the time of the hearing on the motion to exclude this evidence, the prosecutor intended to include in the case-in-chief the evidence of defendant's statements to the police. Thus the motion was argued on the assumption that the defense version of the killing would be placed before the jury during the prosecution's case-in-chief by way of defendant's statements to the officers. Given this assumption, the prosecutor may be understood to have argued that the gun-use evidence would dispel inferences arising from these statements regarding defendant's postoffense state of mind. As it turned out, evidence of defendant's statements to police was not presented during the prosecution's case-in-chief, and thus the postoffense gun-use evidence was vulnerable to a motion to strike on the ground it had not been properly connected to other evidence in the case-in-chief. However, no such motion to strike was made and the failure may be deemed a waiver of the objection to the gun-use evidence. (*Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113, 123 [117 Cal.Rptr. 812, 528 P.2d 1148, 74 A.L.R.3d 986].) As the defense was planning to use Dr. Beaber's testimony, a motion to strike would have been futile in any event, since the same gun-use evidence would have been admissible in rebuttal.

Assuming arguendo the evidence was improperly admitted at the time it was, it is not reasonably probable a more favorable verdict would have been rendered had the evidence been excluded. The evidence would have come in eventually, it was cumulative to the testimony of Crothers that defendant had pointed the handgun at him and, given the other evidence in the case, it is highly unlikely that the issue of defendant's carelessness with firearms played a significant role in the jury's verdict.

*Limiting Instruction*

Defendant contends the trial court erred in failing to instruct the jury, sua sponte, on the limited purposes for which it could consider the testimony of Crothers and Marshall and the postoffense gun-use testimony of Schroff, Davis, and Bass. ■ Trial courts generally have no duty to instruct on the limited admissibility of evidence in the absence of a request. (*People v. Collie* (1981) 30 Cal.3d 43, 63 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) We have left open the possibility that such a duty might be found to exist in "an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." (*Id.* at p. 64.) This is not such an extraordinary case, however.

*Cautionary Instruction on Preoffense Statements*

 Defendant urges error in the trial court's failure to give CALJIC No. 2.71.7,[12] regarding evidence of an accused's preoffense statements. This instruction, when applicable, must be given sua sponte. (*People v. Williams* (1988) 45 Cal.3d 1268, 1315 [248 Cal.Rptr. 834, 756 P.2d 221]; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1224 [249 Cal.Rptr. 71, 756 P.2d 795]; *People v. Heishman* (1988) 45 Cal.3d 147, 166 [246 Cal.Rptr. 673, 753 P.2d 629]; *People v. Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1].) Here the trial court gave CALJIC No. 2.71,[13] which advised the jury to view with caution evidence of *any* out-of-court statement by defendant offered to establish his guilt of the charged offenses. This broad cautionary instruction encompassed evidence of preoffense statements and was adequate in this case. (See *People v. James* (1987) 196 Cal.App.3d 272, 286-287 [241 Cal.Rptr. 691]; *People v. Kozel* (1982) 133 Cal.App.3d 507, 530 [184 Cal.Rptr. 208].) Defendant was not prejudiced by the omission of CALJIC No. 2.71.7.

III. *Prosecutorial Misconduct*

Referring to Crothers's testimony that defendant carried a gun and stated he would "waste any mother fucker that screws with me," the prosecutor argued to the jury that defendant "is somewhat of a self-styled gangster. . . . He's bad, likes to think that he's a bad man, tough. That's the kind of defendant we have here." Defense counsel objected that this was "improper type of evidence, and improper inference from any evidence that was submitted." The court overruled the objection, stating that "this is a matter for the jury to consider in evaluating what the evidence was and what the proper inferences from it are." The prosecutor returned to this theme during his rebuttal argument. After again referring to Crothers's testimony, the prosecutor stated that defendant was a "man who feels the need to carry a gun" and that defendant "thinks he's bad, in colloquial

---

[12] CALJIC No. 2.71.7 states: "Evidence has been received from which you may find that an oral statement of [intent] [plan] [motive] [design] was made by the defendant before the offense with which he is charged was committed. [¶] It is your duty to decide whether such a statement was made by the defendant. [¶] Evidence of an oral statement ought to be viewed with caution." Unless otherwise noted, all references to CALJIC instructions are to the fourth revised edition (1979).

[13] CALJIC No. 2.71 (1980 rev.), as given in this case, states: "An admission is a statement made by defendant other than at his trial which does not by itself acknowledge his guilt of the crime for which he is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made an admission, and if so, whether such statement is true in whole or in part. If you should find that the defendant did not make the statement, you must reject it. If you find that it is true in whole or in part, you may consider that part which you find to be true. [¶] Evidence of an oral admission of the defendant should be viewed with caution."

words, bad meaning tough, tough hombre, little gangster." ■ Defendant contends that the argument constituted misconduct because Crothers's testimony was admitted for a limited purpose and the prosecutor urged its use for a different purpose, i.e., as evidence of defendant's character or criminal disposition, a use precluded by Evidence Code section 1101, subdivision (a) (see fn. 6, *ante*).

The use of opprobrious epithets in jury argument is not in itself misconduct. (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1030 [254 Cal.Rptr. 586, 766 P.2d 1] (lead opn. of Kaufman, J.); *People* v. *Fosselman* (1983) 33 Cal.3d 572, 580 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Wein* (1958) 50 Cal.2d 383, 396 [326 P.2d 457].) On the other hand, urging use of evidence for a purpose other than the limited purpose for which it was admitted is improper argument. Here, however, the evidence that defendant commonly carried a gun was not admitted for a limited purpose and the prosecutor's references to it were not improper. As previously noted, evidence of defendant's statement to Crothers (i.e., "I'll waste any mother fucker that screws with me.") was admitted for the limited purpose of showing defendant's motive and intent at the time of the crime. This limited purpose is in theory distinct from showing that defendant was predisposed to violent crime, but in terms of the impact on the jury it made little difference that the prosecutor argued the evidence showed defendant was a "gangster" who "likes to think he's bad" (improper use for character or disposition) rather than arguing that the evidence showed defendant had the motive or intent to kill anyone who annoyed or interfered with him (proper use for motive and intent). Thus any misconduct was not prejudicial on the facts of this case.

IV. *Self-defense Instructions*

The jury was instructed on self-defense in the language of CALJIC Nos. 5.12, 5.15, 5.17, 5.50, 5.51, and 5.52. Defendant urges error in the failure to instruct also in the language of CALJIC Nos. 5.10 and 5.16[14] on the right to use deadly force to resist commission of a forcible and atrocious felony. (See *People* v. *Ceballos* (1974) 12 Cal.3d 470, 477-479 [116 Cal.Rptr. 233, 526 P.2d 241].) Neither of these instructions was requested. Defendant now contends they were required because the jury may have concluded that defendant used deadly force against Anderson to resist a forcible sodomy.

---

[14] CALJIC No. 5.10 states: "Homicide is justifiable and not unlawful when committed by any person when resisting an attempt to commit a forcible and atrocious crime."

CALJIC No. 5.16 provides alternative definitions of the term "forcible and atrocious crime." The jury may be instructed that the term means "any felony, the character and manner of the commission of which threatens, or is reasonably believed by the defendant to threaten, life or great bodily injury so as to cause in him a reasonable fear of death or great bodily injury," or that certain felonies are forcible and atrocious crimes as a matter of law.

 "The trial court is required to instruct sua sponte only on general principles of law relevant to issues raised by the evidence [citation] and on particular defenses when a defendant appears to be relying on such defense and there is substantial evidence to support it [citation]." (*People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1026 [248 Cal.Rptr. 568, 755 P.2d 1017].) The record here does not show reliance on, or substantial evidence of, a theory of self-defense while resisting a forcible sodomy. Defendant testified that he shot Anderson after Anderson became angry, turned his back while appearing to load his rifle, and made a threatening gesture toward defendant with the rifle. Defendant did not testify to any fear of being forcibly sodomized; he did testify he believed Anderson was going to kill him. Defense counsel's argument to the jury was that defendant acted in fear of being shot, not fear of being sexually assaulted. The jury was instructed on the theory of self-defense presented by the evidence; failure to instruct sua sponte in the language of CALJIC Nos. 5.10 and 5.16 was not error.

## V. *CALJIC No. 2.21 (Willfully False Testimony)*

 Defendant contends it was prejudicial error for the trial court to instruct in the language of CALJIC No. 2.21[15] that the jury could reject in its entirety a witness's testimony found to be willfully false in one material part. Defendant maintains that the instruction was not warranted by the evidence, was superfluous and misleading, and impermissibly altered the burden of proof.

In *People* v. *Allison* (1989) 48 Cal.3d 879, 894-895 [258 Cal.Rptr. 208, 771 P.2d 1294], we approved a long line of intermediate appellate decisions (e.g., *People* v. *Goodwin* (1988) 202 Cal.App.3d 940, 944-945 [249 Cal.Rptr. 430]; *People* v. *Blassingill* (1988) 199 Cal.App.3d 1413, 1418-1420 [245 Cal.Rptr. 599]; *People* v. *Plager* (1987) 196 Cal.App.3d 1537, 1546-1547 [242 Cal.Rptr. 624]; *People* v. *Reyes* (1987) 195 Cal.App.3d 957, 965-966 [240 Cal.Rptr. 752]; *People* v. *Johnson* (1986) 190 Cal.App.3d 187, 192-194 [237 Cal.Rptr. 479]; *People* v. *Hempstead* (1983) 148 Cal.App.3d 949, 956 [196 Cal.Rptr. 412]; *People* v. *Williams* (1975) 51 Cal.App.3d 65, 67-68 [123 Cal.Rptr. 891]) holding that CALJIC No. 2.21 is a correct statement of the law and appropriately given where there is an evidentiary basis to support it. Defendant provides no persuasive reason to reconsider that conclusion.

---

[15] The challenged language states: "A witness willfully false in one material part of his testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you shall believe the probability of truth favors his testimony in other particulars." With minor variations, this language now appears in CALJIC No. 2.21.2 (5th ed. 1988).

There was a sufficient evidentiary basis for the instruction in this case. The jury could reasonably conclude that one or more witnesses had been willfully false in their testimony. To cite but one example, Daniel Crothers and defendant gave sharply conflicting testimony: Crothers described an incident in which defendant pointed a gun at Crothers and said, "I'll waste any mother fucker that screws with me," but defendant denied that the incident ever took place. Since either defendant or Crothers must necessarily have testified falsely, and the jury could have found the falsehood willful, CALJIC No. 2.21 was properly given.

## VI. *CALJIC No. 2.15 (Possession of Stolen Property)*

The jury was instructed in the language of CALJIC No. 2.15[16] that giving a false explanation for possession of stolen property "is a circumstance that may tend to show guilt." Defendant maintains it was error to give the instruction because evidence of his false explanation for possession of Anderson's property could not support a reasonable inference that defendant was guilty of robbery rather than grand theft.

The instruction did not state that defendant's false statements supported an inference of guilt *only* as to the offense of robbery. The instruction was therefore a correct statement of law because, as defendant concedes, the false-statement evidence would support an inference of guilt as to either grand theft or robbery. Nothing in the instruction's language suggested it was intended to assist the jury in deciding which of these offenses defendant committed. ■■■ A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. (*People* v. *Andrews* (1989) 49 Cal.3d 200, 218 [260 Cal.Rptr. 583, 776 P.2d 285].)

In any event, defendant's false explanations for his possession of Anderson's property were not irrelevant in determining whether he was guilty of robbery rather than grand theft. Defendant told Schroff, whom defendant apparently regarded as a good friend, that he had been hired as a chauffeur by a hunter who allowed him use of the motor home. Defendant's conduct

---

[16] As given in this case, CALJIC No. 2.15 stated: "The mere fact that a person was in conscious possession of recently stolen property is not enough to justify his conviction of the crime charged in Count II of the information [i.e., robbery]. It is, however, a circumstance to be considered in connection with other evidence. To warrant a finding of guilty there must be proof of other conduct or circumstances tending of themselves to sustain guilt. In this connection you may consider the defendant's false or contradictory statements, if any, and any other statements he may have made with reference to the property. If a person gives a false account of how he acquired possession of stolen property, this is a circumstance that may tend to show guilt."

in making this false statement supports an inference that he committed the greater crime because the more serious the offense, the stronger the motive for concealment of the true facts. Thus the illegal conduct which defendant's false explanation was intended to conceal was more likely to have been a robbery-murder than a mere theft following a killing in self-defense.

For these reasons, it was not error to instruct in the language of CALJIC No. 2.15.

VII. *Personal Presence During Proceedings*

Defendant contends that his state and federal constitutional rights to presence at trial, due process, confrontation, public trial, and effective assistance of counsel were violated by his absence during (1) a jury view of the murder scene, (2) a discussion regarding the jury's requests for clarification, and (3) the reading of the testimony of four witnesses, and by his counsel's absence during the reading of the four witnesses' testimony.

*Jury View*

After announcing that no more witnesses would be called during the case-in-chief, the prosecutor requested a jury view of the area where Anderson's body was found. Defense counsel noted that defendant would have a right to be there but that counsel did not want defendant "paraded around in handcuffs or shackles . . . ." The prosecutor denied that defendant would be "paraded in front of the jury in those items." There was no further discussion regarding handcuffs or shackles and the court granted the request. On the following morning, in open court, defendant personally waived his right to be present at the view, giving no reason for his decision.

Defendant argues (1) his right to be present at the jury view could not be waived; (2) the waiver was coerced because the alternative was appearing before the jury in shackles; and (3) the court should have denied the request for jury view since the shackling problem was insoluble.

Although the federal Constitution requires a criminal defendant to be present at those stages of trial at which his absence might detract from the fairness of the proceedings (*Faretta* v. *California* (1975) 422 U.S. 806, 819, fn. 15 [45 L.Ed.2d 562, 572-573, 95 S.Ct. 2525]), it does not require the defendant's presence at a jury view (*Snyder* v. *Massachusetts* (1934) 291 U.S. 97, 117-118 [78 L.Ed. 674, 684-685, 54 S.Ct. 330, 90 A.L.R. 575]). Under our state law, a defendant has a right to be present at a jury view (*People* v. *Bush* (1886) 68 Cal. 623, 634 [10 P. 169]), but the right may be waived (*People* v. *Mathews* (1903) 139 Cal. 527, 530 [73 P. 416]; *People* v.

*Benjamin* (1975) 52 Cal.App.3d 63, 76 [124 Cal.Rptr. 799]). Even in capital cases, moreover, the United States Supreme Court has never held that a defendant cannot waive the constitutional right to be present at critical stages of the trial, and we have expressly recognized the validity of such waivers as a matter of state constitutional law. (See *People* v. *Robertson* (1989) 48 Cal.3d 18, 60-62 [255 Cal.Rptr. 631, 767 P.2d 1109].)

We need not decide whether a waiver of the right to presence would be involuntary if the waiver was in response to a ruling requiring the defendant to appear in shackles plainly visible to the jury. Here the prosecutor assured defense counsel that defendant would not be paraded before the jury in shackles and defense counsel abandoned the point without further argument and without eliciting a ruling from the court. We will not speculate as to what ruling the court would have made on this issue. Furthermore, the record fails to show that concern about appearing in shackles motivated defendant to waive his presence at the jury view.

Similarly, we need not decide whether granting the request for a view would have been an abuse of discretion had there been no way to permit the view without significant prejudice to defendant resulting from being seen by the jury in handcuffs or other restraints. There were methods available to avoid or minimize the risk of prejudice. Defendant could have remained in a vehicle within sight and hearing of the other participants during the view, for example, thereby permitting him to attend the view without the jury observing any restraints on his person. Had defense counsel requested a ruling on the issue, we presume in support of the judgment that some such accommodation of the competing interests would have been adopted. Accordingly, the trial court's decision to grant the request for a jury view was not an abuse of discretion.

*Discussions Regarding Jury Inquiries*

During its deliberations the jury sent a note to the court stating that a piece of paper with a name and telephone number on it had been found in one of the exhibits (apparently defendant's luggage), and asking whether there was any way to determine whether the telephone number was that of witness Donnie Marshall. A second note from the jury requested access to a transcript of defendant's interview by law enforcement officers following his arrest. The court discussed both notes with counsel in defendant's absence, stating that since the case was closed to evidence the answer to both questions would have to be negative unless there was a stipulation. Both counsel agreed to this analysis and neither offered to stipulate. The court then called the jury into the courtroom and answered the two inquiries in the negative.

Defendant now argues the trial court erred in discussing the jury's inquiries with counsel in his absence.

During trial, a defendant is not entitled to be personally present at the court's discussions with counsel occurring outside the jury's presence on questions of law or other matters unless the defendant's presence bears a reasonable and substantial relation to a full opportunity to defend against the charges. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 309 [168 Cal.Rptr. 603, 618 P.2d 149].) A defendant claiming a violation of the right to personal presence at trial bears the burden of demonstrating that personal presence could have substantially benefited the defense. (*Id.* at p. 310.)

In *People* v. *Bloyd* (1987) 43 Cal.3d 333 [233 Cal.Rptr. 368, 729 P.2d 802], the jury during deliberations discovered a bottle of Valium in the victim's bathrobe, which had been received in evidence, and sent a note inquiring whether the bottle could be considered. In defendant's absence, defense counsel stipulated to the jury's consideration of the Valium bottle. We found no violation of defendant's right of presence because it was "inconceivable that the defense could do other than permit consideration of the bottle by the jury" and thus defendant could not demonstrate that his absence prejudiced his case or denied him a fair trial. (*Id.* at p. 360.)

Here, as defendant concedes, evidence that he had kept Donnie Marshall's telephone number in his possession could only have hurt his defense, since he had denied having a close relationship with Marshall. The trial court's response, which effectively precluded the jury's consideration of the paper, fully protected defendant's interests. Providing the jury with a transcript of defendant's interview by law enforcement officers could conceivably have provided some benefit to defendant, since during the interview defendant had made some statements consistent with his trial testimony, but it would also have prejudiced defendant by reminding the jury of the numerous blatant falsehoods he had told during the interview. Whether on balance the jury's review of the transcript would have benefited defendant is very doubtful. In any event, both the defense and the prosecution had evidently made conscious decisions during the trial not to offer the transcript in evidence. Presumably defense counsel had discussed the matter with defendant before or during the trial and was aware of his views. Assuming arguendo that defendant would have urged his counsel to place the transcript before the jury, it is highly unlikely that both defense counsel and the prosecutor would have agreed to do so. Accordingly, defendant has not demonstrated that his personal presence could have substantially benefited the defense.

*Reading Trial Testimony During Deliberations*

The jury sent a note to the court during deliberations requesting a reading of the trial testimony of defendant, the autopsy surgeon, a firearms expert, and a defense witness who testified to defendant's stated intention to hitchhike to Santa Monica. The court discussed this request with counsel in defendant's absence. Both the prosecutor and defense counsel waived their right to be present during the reading, defense counsel also waiving defendant's right of presence. The public was excluded from the reading of the testimony; the reading was not reported and took place in the absence of the court and counsel. Defendant now contends this procedure denied him his rights to personal presence at trial, public trial, and effective assistance of counsel.

In *People* v. *Bloyd, supra,* 43 Cal.3d 333, on virtually identical facts, we found no violation of the rights of personal presence at trial or effective assistance of counsel. We noted it was "inconceivable that the defendant would not have jumped at a chance to have *his* version of the events presented once more to the jury" (*id.* at p. 360, italics in original) and stated there was no authority indicating counsel could not consent to a reading of testimony outside the presence of both counsel and defendant (*id.* at p. 361). Defendant maintains that *Bloyd* is not dispositive, primarily because no issue was raised in that case regarding denial of the right to a public trial.

The right to public trial may be waived (*People* v. *Cash* (1959) 52 Cal.2d 841, 846 [345 P.2d 462]), the waiver may be implied from failure to object (*ibid.; People* v. *Hines* (1964) 61 Cal.2d 164, 172 [37 Cal.Rptr. 622, 390 P.2d 398], disapproved on another point in *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 775, fn. 40 [175 Cal.Rptr. 738, 631 P.2d 446]; *People* v. *Blanco* (1959) 170 Cal.App.2d 758, 760-761 [339 P.2d 906]; *People* v. *Tugwell* (1917) 32 Cal.App. 520, 525 [163 P. 508]), and the waiver may be made by defense counsel on defendant's behalf (*People* v. *Moreland* (1970) 5 Cal.App.3d 588, 596 [85 Cal.Rptr. 215]; see *People* v. *Moore* (1983) 140 Cal.App.3d 508, 513 [189 Cal.Rptr. 487] [defense counsel has right to control court proceedings and make decisions involving the defendant's constitutional rights]; *People* v. *Boyd* (1978) 64 A.D.2d 668 [407 N.Y.S.2d 239, 240]; Annot., Exclusion of Public During Criminal Trial (1956) 48 A.L.R.2d 1436, 1452). Assuming the right to public trial extends to the reading of testimony during jury deliberations, the right was effectively waived by defense counsel.

VIII. *Denial of Jury Trial on Severed Count*

Before trial commenced on the capital charge, the court granted defendant's motion to sever from the other charges the count of the information

charging defendant with being a convicted felon in possession of a concealable firearm. After the guilt and penalty phase verdicts were returned, the court proceeded to consider the severed charge. From statements in the record it is apparent that both the court and counsel believed there had already been a waiver of jury trial. The charge was tried to the court and defendant was found guilty. Defendant now contends that the conviction on this charge must be set aside as he never expressly waived his right to jury trial. The Attorney General effectively concedes the validity of defendant's argument. Having independently reviewed the record without finding an express waiver by defendant of his constitutional right to jury trial, we will set aside the conviction on this count.

## IX. *Premeditation and Deliberation*

 Defendant contends that the felony-murder special circumstance must be construed as applying only to willful, deliberate and premeditated murders. We have previously rejected this contention. (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 794-795 [248 Cal.Rptr. 126, 755 P.2d 310].) Defendant provides no persuasive reason to reconsider our conclusion.

### PENALTY ISSUES

## X. *Withholding Mitigating Evidence*

During the proceedings below, defendant's trial counsel stated for the record that he had planned to call defendant's grandmother as a witness at the penalty phase. The grandmother would have testified, in brief, that defendant's parents were divorced shortly after his birth, that his father thereafter remarried twice and his mother four times, that defendant was rejected or at least neglected by his parents, and that as a youth defendant was shy, lonely, and nonviolent. Counsel stated that defendant, "to his credit as a human being . . . did not want to put his elderly grandmother through that kind of experience of the emotional trauma of having to come here and testify." And so, at defendant's request, the grandmother was not called as a defense witness.

 Defendant now contends that trial counsel, in agreeing to abide by defendant's wishes, rendered ineffective assistance and defeated the state's independent interest in assuring a reliable penalty determination in this capital case.

Defendant relies primarily on *People* v. *Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925]. In that case the defendant, with his counsel's consent, pleaded guilty to the charges against him and admitted a special

circumstance allegation. Defendant waived jury trial on the issue of penalty, again with the concurrence of his counsel, presented no mitigating evidence, and requested a verdict of death. The resulting judgment of death was reversed on the grounds that defense counsel, in acceding to defendant's wish not to present mitigating evidence, rendered ineffective assistance and frustrated the state's interest in ensuring reliable penalty verdicts in capital cases. (Pp. 363-364; see also, *People* v. *Burgener* (1986) 41 Cal.3d 505, 541-542 [224 Cal.Rptr. 112, 714 P.2d 1251].)

The logical underpinnings of *Deere, supra,* 41 Cal.3d 353, were recently reexamined in *People* v. *Bloom* (1989) 48 Cal.3d 1194 [259 Cal.Rptr. 669, 774 P.2d 698]. ■■ We concluded that the reliability required by the Eighth Amendment in death penalty cases "is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present." (P. 1228.) *Deere* was disapproved to the extent it suggests that a defendant's failure to present mitigating evidence, in and of itself, is sufficient to make a judgment of death constitutionally unreliable. (*Id.* at p. 1228, fn. 9.)[17] Accordingly, the death judgment in this case is not to be regarded as unreliable merely because defense counsel agreed to defendant's request that his grandmother not be called to testify as a defense witness at the penalty phase.

■■ In *People* v. *Guzman* (1988) 45 Cal.3d 915 [248 Cal.Rptr. 467, 755 P.2d 917], the defense counsel acquiesced in his client's wish that available mitigating character evidence not be presented, but defendant described his background in his own testimony at the penalty phase. We rejected a contention that the defendant was denied effective assistance of counsel, noting that unlike *Deere, supra,* 41 Cal.3d 353, some mitigating evidence had been presented. (45 Cal.3d at p. 961.) Similarly, in the present case, some mitigating evidence was presented, in the form of the jail officer's testimony to defendant's good conduct while incarcerated pending trial.

The proposition that defense counsel should be forced to present mitigating evidence over the defendant's objection has been soundly criticized by commentators. (See, e.g., Bonnie, *The Dignity of the Condemned* (1988) 74 Va.L.Rev. 1363, 1380-1389; Carter, *Maintaining Systemic Integrity in*

---

[17]The dissent's discussion of this issue is remarkable in this respect: One searches the dissent in vain for acknowledgment that the reasoning of *People* v. *Deere, supra,* 41 Cal.3d 353, on which the dissent chiefly relies, has been expressly disapproved, and that the controlling precedent on this issue is now *People* v. *Bloom, supra,* 48 Cal.3d 1194.

*Capital Cases: The Use of Court-Appointed Counsel to Present Mitigating Evidence When the Defendant Advocates Death* (1987) 55 Tenn.L.Rev. 95, 130-142 [hereafter *Maintaining Systemic Integrity*].) ▇ As these commentators point out, an attorney's duty of loyalty to the client means the attorney "should always remember that the decision whether to forego legally available objectives or methods because of non-legal factors is ultimately for the client . . . ." (ABA Model Code Prof. Responsibility, EC 7-8.) To require defense counsel to present mitigating evidence over the defendant's objection would be inconsistent with an attorney's paramount duty of loyalty to the client and would undermine the trust, essential for effective representation, existing between attorney and client. Moreover, imposing such a duty could cause some defendants who otherwise would not have done so to exercise their Sixth Amendment right of self-representation (see *Faretta* v. *California, supra,* 422 U.S. 806) before commencement of the guilt phase (see *People* v. *Hamilton* (1988) 45 Cal.3d 351, 369 [247 Cal.Rptr. 31, 753 P.2d 1109]; *People* v. *Windham* (1977) 19 Cal.3d 121, 127-128 [137 Cal.Rptr. 8, 560 P.2d 1187]) in order to retain control over the presentation of evidence at the penalty phase, resulting in a significant loss of legal protection for these defendants during the guilt phase.

▇ To establish a denial of the Sixth Amendment right to effective assistance of counsel, a defendant must show that counsel failed to perform with reasonable competence, and that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings. (*People* v. *Fosselman, supra,* 33 Cal.3d 572, 584; see also, *Strickland* v. *Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052.].) While selection of defense witnesses is generally a matter of trial tactics over which the attorney, rather than the client, has ultimate control (*People* v. *McKenzie* (1983) 34 Cal.3d 616, 631 [194 Cal.Rptr. 462, 668 P.2d 769]), it does not necessarily follow that an attorney acts incompetently in honoring a client's request not to present certain evidence for nontactical reasons. (See ABA Model Rules Prof. Conduct, rule 1.2, comment ["In questions of means, the lawyer should assume responsibility for technical and legal tactical issues, but should defer to the client regarding such questions as the expense to be incurred and concern for third persons who might be adversely affected."].) ▇ Given the attorney's ethical duty of loyalty to the client, it is "not outside the range of competent attorney actions to fail to present mitigating evidence when the defendant adamantly endorses that position." (*Maintaining Systemic Integrity, supra,* 55 Tenn.L.Rev. at p. 140.)

Even if counsel had acted improperly in honoring defendant's wishes, moreover, the impropriety would not result in reversal of the judgment because the doctrine of invited error operates to estop a party from asserting

an error when the party's own conduct has induced its commission (*People v. Perez* (1979) 23 Cal.3d 545, 549-550, fn. 3 [153 Cal.Rptr. 40, 591 P.2d 63]), and from claiming to have been denied a fair trial by circumstances of the party's own making (*People* v. *Hammond* (1960) 54 Cal.2d 846, 852 [9 Cal.Rptr. 233, 357 P.2d 289]). Thus a defendant who without justification has caused a courtroom disturbance cannot urge the resulting prejudice as grounds for mistrial (*People* v. *Linden* (1959) 52 Cal.2d 1, 28-29 [338 P.2d 397]; *People* v. *Gomez* (1953) 41 Cal.2d 150, 162 [258 P.2d 825]), nor can a defendant who has volunteered information during testimony successfully urge error in the admission of the volunteered statements (*People* v. *Wilkes* (1955) 44 Cal.2d 679, 684 [284 P.2d 481]).

The invited-error doctrine operates, in particular, to estop a defendant from claiming ineffective assistance of counsel based on counsel's acts or omissions in conformance with the defendant's own requests.[18] In *People* v. *Simmons* (1946) 28 Cal.2d 699 [172 P.2d 18], for example, defense counsel, at defendant's insistence and against counsel's own better judgment, asked a police officer on cross-examination whether defendant had not been arrested for a robbery other than the one for which he was then on trial and the officer replied that defendant had been arrested for both robberies. (*People* v. *Simmons, supra,* at p. 722.) Later, on cross-examination of another police officer, defendant insisted that the statement of Webb, an admitted participant in the charged robbery who had pleaded guilty before defendant's trial, be read in its entirety even though it implicated defendant in another robbery. (*Ibid.*) Finally, Webb was called as a defense witness "at defendant's specific and insistent request," (*ibid.*) and "contrary to the advice of his counsel" (*id.* at p. 708), and gave testimony "replete with evasions, inconsistencies and contradictions" (*ibid.*). On appeal from the resulting judgment of conviction, defendant based an ineffective assistance claim on these acts of counsel, but the contention was held to be barred by the invited-error doctrine because in each instance defendant had adamantly insisted at trial on the very actions of which he complained on appeal. (*Id.* at p. 722.) Here also, defendant cannot be permitted to claim that his counsel was deficient for acceding, against counsel's own judgment, to defendant's insistent request that certain evidence not be presented.

We observe, in conclusion, that defendant predicates the claim of ineffective assistance solely on his trial counsel's action in yielding to his demand, and not on any antecedent act or omission of counsel. Defendant does not contend, for example, that counsel failed to adequately investigate

---

[18] The dissent maintains that invited error cannot apply because it covers only induced *trial court* errors. This is a dispute about labels. Whether we call the controlling principle "invited error" or "estoppel," defendant is foreclosed from asserting ineffective assistance of counsel, as shown by the authorities cited in the text.

the availability of this evidence or to advise him regarding its significance. There is nothing in the appellate record to suggest that counsel's performance was deficient in either of these respects and it is the defendant's burden to establish ineffectiveness. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Accordingly, for the reasons given, we reject the contention that trial counsel rendered ineffective assistance by agreeing to defendant's demand that his grandmother not be called to testify as a defense witness at the penalty phase.

## XI. *Penalty Determination Instruction*

The court instructed the jury how to make its penalty determination in the following terms: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant. After having heard all the evidence and having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. If you agree unanimously and beyond a reasonable doubt[19] that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death; however, if you are not satisfied beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

This court has determined that an instruction using the statutory language of section 190.3,[20] such as the instruction given in this case, is potentially confusing and could mislead the jury as to the manner in which penalty should be determined. (*People* v. *Brown* (1985) 40 Cal.3d 512, 544, fn. 17 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].) One danger is that the jury might believe it could perform the weighing

---

[19] The trial court modified the standard jury instruction by inserting a reference to the "beyond-a-reasonable-doubt" standard. We have declined to impose this standard for the determination of penalty in capital proceedings (*People* v. *Heishman, supra,* 45 Cal.3d 147, 189; *People* v. *Thompson, supra,* 45 Cal.3d 86, 135; *People* v. *Miranda* (1987) 44 Cal.3d 57, 107 [241 Cal.Rptr. 594, 744 P.2d 1127]), but this modification could only have worked to defendant's advantage. He does not contend otherwise.

[20] In relevant part, section 190.3 provides: "After having heard and received all of the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole."

process in a mechanical fashion by comparing the number of factors in aggravation with the number in mitigation, or by the arbitrary assignment of weights to the factors. (See *People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115].) The other danger is that the jury might fail to understand that our statutory scheme does not require any juror to vote for the death penalty unless, as a result of the weighing process, the juror personally determines that death is the appropriate penalty under all the circumstances. (*Ibid.*; *People* v. *Brown, supra,* at p. 541.) To determine whether the jury may have been misled to defendant's prejudice, we examine the whole record and in particular the arguments of counsel. (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 650-651 [244 Cal.Rptr. 181, 749 P.2d 836]; *People* v. *Brown, supra,* at p. 544, fn. 17.)

In argument to the jury the prosecutor compared the process of penalty determination to placing weights on a scale, but he cautioned the jury that it was "unlike the system in the laboratory" because the aggravating and mitigating circumstances did not each have the same weight and repeatedly told the jury the determination of what weight to assign to each circumstance was to be made by each juror individually: "You decide which factors have more weight and which have less weight."[21] Thus the jury was not given a mistaken impression of the weighing process as a matter of counting or of assigning weights arbitrarily to the relevant aggravating and mitigating circumstances.

Although the prosecutor repeatedly urged the jury to follow the law if it determined that aggravating circumstances outweighed mitigating circumstances, those repeated urgings were offset by the repeated statements, already mentioned, regarding the jurors' discretionary control over the weighing process. As this court has previously observed, when jurors are told they can determine individually the weight to be assigned to the aggravating and mitigating circumstances, and can decide that one circumstance outweighs all others, they necessarily understand they have discretion to select the appropriate penalty. (*People* v. *Burton* (1989) 48 Cal.3d 843, 873 [258 Cal.Rptr. 184, 771 P.2d 1270].) Also, the prosecutor on one occasion

---

[21] The prosecutor made these other statements to the same effect: "The question is in your mind, for you to resolve, is how much weight to give each of these factors. If you feel that age is the most important factor in this case, you'll give that more weight. And that may bring the scale towards even or down to mitigation. If you feel sympathy is a factor that you feel the defendant is entitled to and is the greatest factor in this case, that, of course, will outweigh these others. That's something for you to decide . . . ." "You decide what weight to give these various factors, and you decide how to place them on this scale, and you decide which way this scale goes down." "You decide how much weight to give those factors in aggravation—felony convictions, the circumstances of the crime—and how much weight to give those factors in mitigation—the effects of alcohol, perhaps; the age of the defendant; sympathy for the defendant. You decide how much weight to give it."

described the jury's penalty function expressly in terms of determining the appropriate penalty, stating: "The system is designed in such a way that it is felt better for 12 members of the community, who reflect the values of the community, to decide what is an appropriate punishment in this most serious of cases." In addition, the jurors were expressly instructed they could consider sympathy for defendant in determining penalty.

Having been thus properly informed that the weighing process involved individual discretion and was intended to result in a determination of the appropriate penalty, and that sympathy for defendant could play a role in this determination, the jurors could not have been misled by the prosecutor's repeated references to the mandatory character of the jurors' duty to impose the death penalty if the aggravating circumstances outweighed the mitigating. Nor could the prosecutor's remarks, viewed as a whole, have led the jurors to believe that the responsibility for determining the appropriateness of the death penalty rested on someone or something besides themselves. (See *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 238-240, 105 S.Ct. 2633].)

Having reviewed the entire record, we conclude the jury was not misled to defendant's prejudice regarding the penalty determination process.

XII. *Instruction Defining "Aggravate" and "Mitigate"*

Shortly after deliberations commenced, the jury requested definitions of the terms "aggravating" and "mitigating." The court suggested to counsel that the jury be instructed that the dictionary defines "aggravate" as "to make worse, more serious, or more severe," and it defines "mitigate" as "to make less severe or painful; to cause to become less harsh or hostile." Defendant's counsel answered, "That's fine." A written instruction containing these definitions, and identifying the dictionary from which they were taken, was then sent into the jury room.

 Defendant contends that the giving of this instruction was prejudicial error because the definitions are too narrow and imply that the penalty determination turns on a balance between good and bad rather than between life and death (see *People* v. *Brown, supra,* 40 Cal.3d 512, 541-542, fn. 13). In particular, he maintains that the definition of "mitigate" could lead the jury to believe it could consider as mitigating only circumstances which made the capital offense itself "less severe or painful" and therefore to ignore mitigating character and background evidence (see *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954]; *Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6, 106 S.Ct. 1669]).

We rejected an argument similar to the one raised here in *People* v. *Karis,* *supra,* 46 Cal.3d 612. In that case one juror informed the others during deliberations that "mitigate" was defined in the dictionary as "to make or become milder, less severe, less rigorous, or less painful; moderate." (P. 644.) We concluded that it was misconduct for jurors to consult a dictionary but that defendant was not prejudiced: "While the dictionary definition of 'mitigating' may not have been particularly helpful to the jury in understanding the use of the term in this context, defendant offers no persuasive argument to support a conclusion that the jury might have been misled. He suggests that if the jury had believed it could consider as mitigating evidence that did not pertain directly to the crime, notwithstanding the instruction, consideration of that definition would lead them to conclude that to be considered mitigating the factors had to make the crimes themselves 'mild, soft, or tender,' or 'less severe, less rigorous, less painful, moderate.' [¶] Nothing in the definition suggests the restricted meaning that defendant believes the jury may have attributed to the word mitigating." (P. 645.)

"Aggravating" and "mitigating" are commonly understood terms which need not be defined for the jury. (*People* v. *Malone* (1988) 47 Cal.3d 1, 55 [252 Cal.Rptr. 525, 762 P.2d 1249].) We have stated that certain definitions, while not required, provide a "helpful framework" for the jury's consideration of particular aggravating and mitigating circumstances. (*People* v. *Dyer* (1988) 45 Cal.3d 26, 77-78 [246 Cal.Rptr. 209, 753 P.2d 1].) Definitions found to be helpful include a definition of an aggravating circumstance as " 'any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the offense itself' " and a definition of a mitigating circumstance as " 'any fact, condition or event which, as such, does not constitute a justification or excuse for the offense in question, but which may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.' " (*Ibid.*; see also, *People* v. *Adcox* (1988) 47 Cal.3d 207, 269-270 [253 Cal.Rptr. 55, 763 P.2d 906].)

 Here the jury was expressly instructed that the circumstances to be considered in making the penalty determination included "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death" and that "you may consider sympathy for the defendant in determining penalty." (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr 309, 671 P.2d 813].) The arguments of counsel likewise explained the proper scope of mitigating circumstances in the determination

of penalty. Viewing the arguments of counsel and the entire body of instructions, we are not persuaded that defendant suffered any prejudice from the giving of the challenged instruction.

### XIII. *Moral Justification Instruction*

In accordance with the language of section 190.3, factor (f), the jury was instructed to take into account in determining penalty "whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct." Defendant contends it was error to instruct in this language because it could be interpreted as precluding the jury from considering as mitigating a defendant's sincere but *unreasonable* belief in the moral justification of his conduct.

■ As noted, the jury was given an expanded factor (k) instruction stating that the circumstances properly considered in determining penalty included "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." This instruction permits the penalty jury to consider in mitigation a defendant's sincere but unreasonable belief in justification. (See *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1247 [259 Cal.Rptr. 669, 774 P.2d 698]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 297 [247 Cal.Rptr. 1, 753 P.2d 1052] [nonextreme mental disturbance included under factor (k)]; *People* v. *Guzman, supra,* 45 Cal.3d 915, 965 [same].) There is no indication the jury was misled regarding its duty to consider relevant mitigating evidence.

### XIV. *Prior Felony Convictions*

At the penalty phase it was stipulated that defendant had been previously convicted in Oregon of the felony offenses of second degree robbery, second degree burglary, first degree forgery, second degree escape, and unauthorized use of a vehicle. The jury was informed of the stipulation and of the statutory definition under Oregon law of second degree robbery. The jury was also informed that the escape conviction resulted when defendant was reported missing from a landscape crew working outside the fenced-in area of the institution in which he was then incarcerated, and that defendant was arrested the next day without incident.

Defendant contends that the trial court erred in failing to obtain express waivers of constitutional rights from defendant before accepting the stipulation, and that the trial court erred in overruling a defense objection that three of the prior convictions were inadmissible as they were for offenses that would not qualify as felonies in this state.

## Waiver of Rights

■ Defendant relies on *In re Yurko* (1974) 10 Cal.3d 857 [112 Cal.Rptr. 513, 519 P.2d 561], in which this court held that an accused must be advised, before admitting the truth of prior-conviction allegations, of the specific constitutional protections waived by the admission, and on *People* v. *Hall* (1980) 28 Cal.3d 143, 157, footnote 9 [167 Cal.Rptr. 844, 616 P.2d 826], in which we imposed similar requirements for a stipulation admitting convicted-felon status as an element of the offense of possession of a concealable weapon by a convicted felon. However, as this court has held, the requirements of *Yurko* and *Hall* do not apply to a stipulation that is "not the legal equivalent of a guilty plea or other admission which necessarily would have definite penal consequences." (*People* v. *Hovey* (1988) 44 Cal.3d 543, 567 [244 Cal.Rptr. 121, 749 P.2d 776].) Here, evidence of the prior convictions was introduced as one of the circumstances relevant to the penalty determination, a purpose that is "not comparable to proving ex-felon status as an element of a criminal offense" (*People* v. *Karis, supra,* 46 Cal.3d 612, 639; see also, *People* v. *Stuckey* (1988) 199 Cal.App.3d 876, 882 [245 Cal.Rptr. 225] [*Yurko* requirements inapplicable to factual stipulations not tantamount to plea or admission]).

## Out-of-state Convictions

■ Defendant contends three of his Oregon prior convictions (i.e., second degree robbery, second degree burglary, and unauthorized vehicle use) were inadmissible under section 190.3, factor (c), because they would not qualify, under the least-adjudicated-elements test of *People* v. *Crowson* (1983) 33 Cal.3d 623, 632 [10 P. 169], as felonies under California law. But in *Crowson* we were concerned with the proper application of section 668, which defines the circumstances under which prior convictions may be used to enhance punishment for subsequent offenses. Section 668 does not apply to the consideration of prior felony convictions for purposes other than enhancement of punishment. On the other hand, section 668 illustrates that when the Legislature intends to impose restrictions on the use of out-of-state convictions, it expresses that limitation clearly.[22] (See also, § 190.2, subd. (a)(2) ["For the purpose of this paragraph an offense committed in another jurisdiction which if committed in California would be punishable as first or second degree murder shall be deemed murder in the first or second degree."].) In the absence of limitation, a reference to "prior felony

---

[22] "Every person who has been convicted in any other state, government, country, or jurisdiction of an offense for which, if committed within this state, such person could have been punished under the laws of this state by imprisonment in a state prison, is punishable for any subsequent crime committed within this state in the manner prescribed by law and to the same extent as if such prior conviction had taken place in a court of this state." (§ 668.)

convictions" is deemed to include any prior conviction which was a felony under the laws of the convicting jurisdiction. (See, e.g., *Barnes* v. *District Court of Appeal* (1918) 178 Cal. 500, 504-505 [173 P. 1100] [disbarment for conviction of felony involving moral turpitude]; *People* v. *Davis* (1985) 166 Cal.App.3d 760, 764-766 [212 Cal.Rptr. 673] [escape by prisoner convicted of felony]; *People* v. *Domenico* (1953) 121 Cal.App.2d 124, 127 [263 P.2d 122] [possession of concealable firearm by convicted felon]; *People* v. *Theodore* (1953) 121 Cal.App.2d 17, 29-30 [262 P.2d 630] [impeachment with prior felony conviction]; *People* v. *Gutkowsky* (1950) 100 Cal.App.2d 635, 639-641 [224 P.2d 95] [use of prior felony conviction to determine minimum term of imprisonment].) Section 190.3, factor (c), provides without limitation that the trier of fact shall consider in determining penalty "[t]he presence or absence of *any* prior felony conviction" (italics added). Under this language, the court properly overruled defense counsel's objection to use of defendant's prior Oregon convictions for offenses defined as felonies by Oregon law.[23]

## XV. *Guilt Phase Evidence*

Referring back to his contentions regarding improper admission of certain guilt phase evidence, including virtually the entire testimony of Crothers and Marshall, as well as those portions of the testimony of Schroff, Davis, and Bass regarding defendant's postoffense weapon use, defendant first assumes we find the evidence to have been improperly admitted but conclude the error was not prejudicial at the guilt phase. On these assumptions, defendant argues that the asserted error was prejudicial at the penalty phase and requires reversal of the judgment as to penalty. Having concluded, contrary to defendant's assumption, that this evidence was all properly admitted at the guilt phase, we need not address this contention.

Assuming that the same evidence was properly admitted at the guilt phase, defendant next contends the court should have instructed the jury sua sponte to disregard this evidence in determining penalty. We rejected the same contention in *People* v. *McLain* (1988) 46 Cal.3d 97, 113 [249 Cal.Rptr. 630, 757 P.2d 569], holding that, in the absence of a request, the trial court is under no duty to give such an instruction at the penalty phase in regard to evidence received at the guilt phase.

---

[23] Section 190.3 states that the trier of fact at the penalty phase shall take into account the factors enumerated therein "if relevant." As defendant has not argued that his Oregon convictions are irrelevant to determination of penalty, we do not decide in this case what limitations, if any, section 190.3's relevancy requirement imposes on use of other-jurisdiction felony convictions. We do not decide, for example, whether such convictions would be admissible under factor (c) if based on conduct not criminal under California law. Nor do we address questions regarding the trial court's discretion to exclude such convictions pursuant to Evidence Code section 352.

 Defendant next contends the court should have instructed the jury sua sponte that unadjudicated criminal activity of a defendant involving the use, attempted use, or threat of violence (§ 190.3, factor (b)) could be considered in aggravation only if the activity was proved beyond a reasonable doubt (see *People v. Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279]), and that the jury should have been instructed at the penalty phase, as it had been instructed at the guilt phase, to view with caution evidence of a defendant's oral admissions.

Although the jury was instructed that in determining penalty it could consider, among other things, the presence or absence of criminal activity involving the use, attempted use, or threat of violence, the prosecutor did not argue that any evidence relating to this factor had been presented. The only aggravating factors cited by the prosecutor during argument were the circumstances of the crime (§ 190.3, factor (a)), and defendant's prior felony convictions (§ 190.3, factor (c)). As the evidence in question was not offered as "other crimes" evidence in aggravation, a reasonable-doubt instruction was not required (*People v. Rich* (1988) 45 Cal.3d 1036, 1121-1122 [248 Cal.Rptr. 510, 755 P.2d 960]; *People v. Poggi* (1988) 45 Cal.3d 306, 341 [246 Cal.Rptr. 886, 753 P.2d 1082]; *People v. Williams* (1988) 44 Cal.3d 1127, 1147 [245 Cal.Rptr. 635, 751 P.2d 901]), nor was it necessary that the jury be reinstructed to view with caution evidence of defendant's oral admissions.

Finally, defendant contends he was prejudiced by the prosecutor's failure to give timely pretrial notice under section 190.3[24] that evidence of defendant's statements to Crothers would be offered in aggravation at the penalty phase. As noted, the prosecutor did not offer any such evidence in aggravation.

## XVI. *Prosecutorial Misconduct*

Defendant contends that two of the prosecutor's statements in argument to the jury at the penalty phase constituted misconduct. First, in explaining that the "circumstances of the crime" (§ 190.3, factor (a)) could be considered as a factor in determining penalty, the prosecutor stated: ". . . it's the same sort of things you considered during the guilt phase of this trial—the condition and circumstances of the body, the manner in which the person was killed, the conduct of the defendant following the execution of the victim, the defendant's conduct up until his arrest, *and even the defendant's*

---

[24] "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." (§ 190.3, 4th par.)

*demeanor while on the stand.*" (Italics added.) Defendant maintains that by referring to his demeanor while testifying, the prosecutor was improperly arguing that the jury could consider in aggravation defendant's lack of remorse and failure to confess guilt.

The prosecutor's remark was never amplified or explained and its meaning is unclear. The prosecutor may have been referring merely to the strength of the evidence of defendant's guilt and the lack of credibility in defendant's testimony. ▉ Assuming the prosecutor was referring to defendant's failure to demonstrate remorse, comment on a capital defendant's lack of remorse is proper if it does no more than suggest the inapplicability of a mitigating factor. (*People* v. *Walker* (1988) 47 Cal.3d 605, 650 [253 Cal.Rptr. 863, 765 P.2d 70].) Certainly no reasonable juror could have construed the prosecutor's remark as an invitation to treat either defendant's apparent lack of remorse or his failure to confess as a separate aggravating circumstance. In any event, even assuming the remark was improper, an admonition would have cured the harm, and so the failure to object or request an admonition waived any claim of misconduct. (*Ibid.*; *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].)

Defendant next complains of the following statements: "The system is designed in such a way that it is felt better for 12 members of the community, who reflect the values of the community, to decide what is an appropriate punishment in this most serious of cases. No back-room bargaining between the defense and the prosecution. No quiet, closed-door sessions. This is—*if you want to have a voice in your community and an effect upon the law in the community, this is your opportunity.*" (Italics added.) ▉ Defendant contends this remark urged the jurors to consider the effect of their verdict on the community, and thereby improperly appealed to the jurors' passions and deflected them from considering the particularized features of the offense and the offender.

Defendant appears to have misconstrued the point of the prosecutor's remarks, which seems to have been that the jurors were to "express the conscience of the community on the ultimate question of life or death" (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 519 [20 L.Ed.2d 776, 783, 88 S.Ct. 1770]), and also that, in general, jurors in a capital case play a particularly important role in the criminal justice system. No reasonable juror would have construed the remarks as urging the jurors to follow community sentiment rather than their own judgment. In any event, no objection was made and an admonition would have cured any harm, so the issue is not reviewable. (*People* v. *Green, supra,* 27 Cal.3d 1, 34.)

## XVII. *Modification Motion*

After the death penalty verdict was returned, defense counsel moved to reduce the verdict on the ground that it was disproportionate to verdicts rendered in other similar cases. This motion was considered along with the automatic motion for modification of a death penalty verdict (§ 190.4, subd. (e)). Before ruling on these motions, the court reviewed a presentence report containing summaries of interviews the probation officer had conducted with Anderson's widow and Anderson's mother. Attached to the presentence report were letters to the court from the widow and the mother and a petition requesting imposition of the death penalty. The petition apparently had been circulated in communities where members of Anderson's family resided. The interviews and the letters contained references to the effect of Anderson's death on members of his family.

The court denied the automatic modification motion, explaining it was satisfied beyond a reasonable doubt that defendant was guilty of first degree murder, that the special circumstance was true, and that the factors in aggravation outweighed those in mitigation.[25] The court expressly stated that defendant's testimony regarding the circumstances of the killing was not credible.[26]

Before ruling on counsel's motion to reduce the verdict as disproportionate, the court remarked that while it had not conducted a study of death penalty verdicts, this case was not one of the "most egregious, aggravated cases" or a "classic case" for imposition of the death penalty.[27] The court

---

[25] The trial court stated both that "the jury findings that the circumstances in aggravation outweigh the circumstances in mitigation are supported by the weight of the evidence" and that "the court's own determination is that the factors in aggravation outweigh those in mitigation beyond any reasonable doubt."

[26] "Although the defendant testified that the victim's actions provoked the defendant's attack, it is apparent that the jury did not accept that explanation, nor do I. I can readily accept the possibility that the victim may have said or done something to anger the defendant, but the court finds that such fact—that is, the fact that the defendant was unduly and unreasonably angered by the victim's actions or words—is of little weight as a mitigating circumstance."

[27] "I have not made an exhaustive study of all death-penalty verdicts. But based upon the knowledge that I do have, it's clear that this case does not have such factors as torture, sadism, extreme viciousness, multiple killings, serious prior violence, or extensive preplanning which often typify death-penalty cases. [¶] To put it another way, if we reviewed all special-circumstance murder cases with the objective of imposing the death penalty only in those cases which were the most egregious, aggravated cases, with the more serious cases getting the death penalty and the other cases getting life imprisonment without the possibility of parole, there's simply no question in my mind that this is not a case that would fit in the first category, but it is one that would not. . . . [¶] Perhaps another way still of putting it is in looking at the factors in aggravation and mitigation, there really aren't a lot of factors with a great deal of weight both ways. In looking at those factors, I think it's clear beyond any

then denied the proportionality motion on the ground it lacked authority to undertake that form of review.

Defendant contends that the court had authority to reduce the verdict as disproportionate and so erred in declining to consider counsel's motion on its merits, that the court improperly considered victim impact evidence in ruling on the automatic modification motion, and that the court's remarks reveal it applied an incorrect standard in ruling on the modification motion by failing to consider whether the verdict of death was appropriate both as to the offense and the offender.

*Trial Court Proportionality Review*

Defendant's argument confuses intercase and intracase proportionality review. ■■ Defendant's motion in the trial court requested intercase review, an examination of whether imposition of the death penalty in this case is disproportionate to the penalties imposed on other persons for similar offenses. Intercase proportionality review is not constitutionally required (*Pulley* v. *Harris* (1984) 465 U.S. 37, 51-54 [79 L.Ed.2d 29, 40-43, 104 S.Ct. 871]) and we have consistently declined to undertake it (see, e.g., *People* v. *Johnson, supra,* 47 Cal.3d 1194, 1253; *People* v. *Adcox, supra,* 47 Cal.3d 207, 274; *People* v. *Hamilton* (1988) 46 Cal.3d 123, 158 [249 Cal.Rptr. 320, 756 P.2d 1348]). We likewise decline to authorize or require intercase proportionality review by trial courts. (See *People* v. *Allen, supra,* 42 Cal.3d 1222, 1285-1288 [equal protection does not require "disparate sentence" review of death sentences under section 1170, subdivision (f)].)

In support of his argument that trial courts may undertake proportionality review, defendant relies on *People* v. *Leigh* (1985) 168 Cal.App.3d 217 [214 Cal.Rptr. 61]. But the holding in that case is that trial courts have discretion to determine *intracase* proportionality—i.e., to determine whether the sentence imposed is proportionate to the individual culpability of the defendant, irrespective of the punishment imposed on others (see *People* v. *Adcox, supra,* 47 Cal.3d 207, 274; *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [99 Cal.Rptr. 313, 492 P.2d 1]). Defendant's motion in the trial court did not seek intracase proportionality review.

*Victim Impact Evidence*

■■ ■■ Defendant relies on *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], in which the United States Supreme

---

reasonable doubt the factors in aggravation outweigh the factors in mitigation. But neither the factors in aggravation nor the factors in mitigation put the case quite in the same kind of case as the classic case where we view the death penalty, at least in my perception of it."

Court held that the Eighth Amendment prohibits a jury, during the sentencing phase of a capital murder trial, from considering victim impact evidence—i.e., evidence of the personal characteristics of the murder victim and members of the victim's immediate family, evidence of the emotional impact of the murder on the family members and evidence of the family members' views regarding the crime, the defendant, and the appropriate punishment. (See also, *South Carolina* v. *Gathers* (1989) 490 U.S. __ [104 L.Ed.2d 876, 109 S.Ct. 2207].) ▦ Defendant maintains that the constitutional prohibition applies when the trial court is considering the automatic motion to modify a death verdict, as well as to the penalty phase of the trial, and that the prohibition was violated in this case.

In ruling on the motion to modify a death verdict, the trial court is to "review the evidence" and to "make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." (§ 190.4, subd. (e).) Thus, quite apart from any constitutional prohibition, the trial court is prohibited by statute from considering, when ruling on the modification motion, any evidence not presented to the jury during the trial. (*People v. Jennings* (1988) 46 Cal.3d 963, 994 [251 Cal.Rptr. 278, 760 P.2d 475].)

Trial courts are generally presumed to have understood and followed established law (*Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913 [141 Cal.Rptr. 133, 569 P.2d 727]); having reviewed the record in this case, we conclude the presumption has not been rebutted. In stating the reasons for his ruling on the motion, the trial judge referred only to the evidence presented to the jury and did not indicate his decision was in any way influenced by the presentence report or the victim impact evidence it contained. (See *People* v. *Jennings, supra,* 46 Cal.3d 963, 994-995.) Although the judge did state he had read and considered the presentence report, we assume he considered the report solely for the permitted purpose of sentencing on the noncapital offenses (i.e., robbery and possession of a concealable firearm by a convicted felon). (See *People* v. *Babbitt* (1988) 45 Cal.3d 660, 724-725 [248 Cal.Rptr. 69, 755 P.2d 253].)

*Standard for Automatic Modification Motion*

Defendant maintains that in ruling on the automatic modification motion the trial court is required to independently determine not only whether aggravating circumstances outweigh mitigating circumstances but also whether death is the appropriate penalty under all the circumstances. According to defendant, the trial judge's remarks indicate that in ruling on the motion he made only the first determination. Defendant further argues that

certain of the trial judge's remarks reflect an opinion that death is *not* the appropriate penalty in this case. As we explain, defendant's arguments employ incorrect premises.

■ First, in ruling on the automatic motion to modify a death verdict, the trial judge's function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, *the weight of the evidence supports the jury verdict.* (See *People* v. *Allison, supra,* 48 Cal.3d 879, 913-916 (conc. opn. of Kaufman, J.); *People* v. *Heishman, supra,* 45 Cal.3d 147, 200; see also, *People* v. *Frierson* (1979) 25 Cal.3d 142, 193, fn. 7 [158 Cal.Rptr. 281, 599 P.2d 587] (conc. opn. of Mosk, J.) [construing similar provision of 1977 death penalty law].) Second, the question whether aggravating circumstances outweigh mitigating circumstances cannot be separated from the determination of appropriateness for, as we have explained, the weighing of aggravating and mitigating circumstances *is the method* by which the jury determines which penalty is appropriate. (*People* v. *Allen, supra,* 42 Cal.3d at p. 1276; *People* v. *Brown, supra,* 40 Cal.3d at p. 541.) Thus the trial judge's stated conclusion—i.e., "the jury findings that the circumstances in aggravation outweigh the circumstances in mitigation are supported by the weight of the evidence"—also constitutes a conclusion that the jury's determination of appropriateness was supported by the weight of the evidence.

Finally, statements made by the court in connection with defendant's request for intercase proportionality review—that this case was not one of the "most egregious, aggravated cases" or a "classic case" for imposition of the death penalty—do not demonstrate, nor may they fairly be understood to imply, that the trial judge viewed death as an inappropriate penalty, much less that he had failed to exercise his independent judgment to determine whether the weight of evidence supported the penalty verdict or that, having exercised independent judgment, he had determined that the weight of the evidence did not support a death verdict.

XVIII. *Proportionality of Sentence*

■ Defendant contends that the death penalty is disproportionate as applied in this case. To the extent defendant is seeking intercase proportionality review, we adhere to our position, noted previously, that such review is not required. (*People* v. *Johnson, supra,* 47 Cal.3d 1194, 1253.) To the extent defendant contends the penalty of death is disproportionate to his individual culpability (*People* v. *Dillon, supra,* 34 Cal.3d 441, 477-482), we reject the contention on its merits. Defendant murdered a stranger to obtain his

possessions, shooting him five times and stripping the body of valuables. (See *People* v. *Adcox, supra,* 47 Cal.3d 207, 274-275.) Defendant's claim of provocation was found wanting by both the jury and the trial court and, as the trial court remarked in denying the automatic motion to modify penalty, defendant's conduct exhibited "a high degree of cruelty and callousness."

## XIX. *Constitutionality of Death Penalty Law*

Defendant raises various challenges to the constitutionality of the 1978 death penalty law, all of which he concedes have been rejected by this court in recent decisions. (E.g., *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779.) Defendant provides no persuasive reason to reconsider any of these issues.

### DISPOSITION

The conviction and sentence for possession of a concealable firearm by a convicted felon is reversed. The judgment imposing the death penalty is affirmed in all other respects.

Lucas, C. J., Panelli, J., Eagleson, J., and Kennard, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment insofar as it sets aside defendant's conviction for possession of a concealable firearm by a convicted felon: defendant was denied his constitutional right to trial by jury on the underlying charge.

I dissent, however, from the judgment in all other respects. As I shall show, the judgment should be reversed in its entirety—or at the very least it should be vacated as to penalty. Specifically, the convictions for first degree murder and robbery and the dependent findings on the use of a firearm in the murder, the use of a firearm in the robbery, and the special circumstance of felony-murder-robbery, should be set aside for each of two reasons: the trial court (1) erroneously admitted certain testimony by one Daniel Crothers and (2) erroneously instructed on the inference that might be drawn when a person gives a false account of how he acquired possession of stolen property. Those convictions and findings should at least be vacated for *Castro* error. (*People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].) The verdict of death should be set aside because of *Deere* error (*People* v. *Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925]) and also because of *Brown* error (*People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom.*

*California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]). Finally, the sentence should be vacated since the trial court proceeded erroneously in passing on defendant's application for modification of the verdict of death.

## I

The trial court erred when it ruled admissible, and subsequently admitted, certain testimony by Daniel Crothers: during the summer of 1983 Crothers saw defendant carrying a handgun on five or six occasions; he asked why he carried the weapon; defendant pointed the gun at him and replied, "I'll waste any mother fucker that screws with me."

Prior to trial the prosecutor moved *in limine* for a ruling that Crothers's testimony was admissible. He argued in substance as follows. Among the issues that would prove material to the People's case were (1) whether the killing was intentional, (2) whether defendant's motive was robbery, and (3) in anticipation of an expected defense, whether defendant acted in self-defense. Defendant's alleged act and statement described in Crothers's testimony had a tendency to prove that he intended to kill, that his motive was robbery, and that he did not kill in self-defense. The evidence was not barred by Evidence Code section 1101, subdivision (a) (hereafter section 1101(a)), because it was not evidence of character to prove conduct. Nor was it excludable under Evidence Code 352 (hereafter section 352) because it was substantially more probative than prejudicial.

Defendant opposed the motion. He argued that Crothers's testimony was irrelevant to any material issue, was barred as character evidence by section 1101(a), and was excludable under section 352 as substantially more prejudicial than probative.

At a hearing on the motion, the prosecutor represented that he intended to introduce in his case-in-chief a statement by defendant to Detective Bruce Correll that he killed the victim and intended to do so, but only in self-defense. He also detailed the evidence, other than defendant's alleged act and statement, that he had available to rebut a claim of self-defense: "Well, during our case in chief the other evidence to negate the defense that will be part of the admissions that have come in would be circumstances around—by the pathologist and the criminalist regarding the placement of the wounds, in particular three wounds in close proximity behind the ear, which we hope to suggest was more of an execution than a self defense, panick [*sic*] situation. [¶] Further, the trigger pull on the weapon was

greatly—was much greater than the normal trigger pull on a five-shot weapon, and that—again, circumstantial evidence—required real deliberation, premeditation and not a panic self-defense firing blindly at an individual. It was thoughtful, well-aimed, well-deliberated, and essentially the victim was executed."

The trial court ruled Crothers's testimony admissible. It expressly rejected defendant's challenge under section 352. It found the probative value of the evidence to be "considerable": it determined impliedly, if not expressly, that the presence of intent to kill, the nature of defendant's motive, and the absence of self-defense would be material issues in the People's case; that the evidence had a tendency to prove those issues; and that it was not merely cumulative to other evidence available for the same purposes. It also found the prejudicial effect of the evidence to be "quite slight": "This is a very weak statement and act in terms of the amount of prejudice it bears to the defendant on this issue of a prior crime." Accordingly, it ruled: "Well, it seems clear to me that this evidence that we're talking about is not merely cumulative, and after having weighed the prejudicial—the undue prejudice that might befall, which I find to be quite slight, to the probative weight of the evidence which I find to be considerable, I find no basis to exclude it under section 352."

At trial the court admitted Crothers's testimony. The prosecution did not introduce any statement by defendant relating to self-defense either in its case-in-chief or in rebuttal.[1]

As stated above, the trial court erred when it ruled Crothers's testimony admissible and subsequently admitted that testimony at trial.

Section 352 provides that "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

---

[1] Defendant did not formally object to Crothers's testimony when it was actually offered. "Since a ruling on a motion *in limine* is not generally binding on the trial court, which is free to reconsider its ruling at the time the challenged evidence is offered, the failure to object normally constitutes a waiver." (*People* v. *Karis* (1988) 46 Cal.3d 612, 634, fn. 16 [250 Cal.Rptr. 659, 758 P.2d 1189].) It is evident from the record, however, that the trial court and the parties treated defendant's opposition to the prosecution's motion as the equivalent of an objection. In such circumstances, the failure to raise a formal objection cannot be deemed a waiver. (See *id.* at p. 635, fn. 16.)

Although the trial court's discretion under section 352 is broad in the general case, it is narrow when the evidence under challenge involves "other crimes." Such evidence embraces not only criminal offenses strictly defined but also, it appears, words or deeds—like defendant's alleged act and statement—that merely reveal a criminal disposition. (See *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1136 [240 Cal.Rptr. 585, 742 P.2d 1306].) "[E]vidence of other crimes . . . can be highly prejudicial. . . . [U]nder Evidence Code section 352, the probative value of this evidence must outweigh its prejudicial effect. [Citations.] Since 'substantial prejudicial effect [is] inherent in [such] evidence,' uncharged offenses are admissible only if they have *substantial* probative value. If there is any doubt, the evidence should be excluded." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 318 [165 Cal.Rptr. 289, 611 P.2d 883], fns. omitted & italics in original.)

"Probative value and prejudice obviously are not commodities subject to quantitative measurement. Nonetheless, we may identify some of the guidelines which courts follow in performing the balancing process . . . [under section 352]. The chief elements of probative value are relevance, materiality and necessity. [¶] Before permitting the jury to hear evidence of other offenses the court must ascertain that the evidence (a) 'tends logically, naturally and by reasonable inference' to prove the issue upon which it is offered; (b) is offered upon an issue which will ultimately prove to be material to the People's case; and (c) is not merely cumulative with respect to other evidence which the People may use to prove the same issue." (*People* v. *Schader* (1969) 71 Cal.2d 761, 774-775 [80 Cal.Rptr. 1, 457 P.2d 841], fns. omitted.) By contrast, the chief element of prejudice is the potential to lead a jury to convict the defendant because of his bad character or record and not on the basis of his conduct. (See *id.* at p. 774; *People* v. *Karis, supra,* 46 Cal.3d at p. 638.)

"Evidence of a defendant's statement regarding possible future criminal conduct in a hypothetical situation"—even if it is not "other crimes" evidence properly so called—"has at least as great a potential for prejudice in suggesting a propensity to commit crime as evidence of other crimes. Therefore, the content of and circumstances in which such statements are made must be carefully examined . . . in assessing whether the probative value of the evidence outweighs that potential prejudicial effect." (*People* v. *Karis, supra,* 46 Cal.3d at p. 636.)

In determining whether a trial court has erred in ruling on a matter entrusted to its discretion, a reviewing court must, of course, apply the abuse-of-discretion standard. (E.g., *People* v. *Karis, supra,* 46 Cal.3d at

p. 637.) That standard calls for deference—but it does not, and cannot, require abdication. In this case, the trial court abused its discretion.

First, the prejudicial effect of Crothers's testimony was substantial. This is so as a matter of law. The evidence appears to come within the category of "other crimes" broadly construed. In any event, because it relates defendant's alleged statement regarding possible future criminal conduct in a hypothetical situation, it has at least as great a potential for prejudice as evidence of "other crimes" properly so called. The prejudicial effect of the testimony is also substantial as a matter of fact. The point is proved by the nature of defendant's alleged act, pointing his gun at Crothers, and by the substance of his alleged statement, "I'll waste any mother fucker that screws with me." I recognize that the trial court was of the opposite view. But as explained above, such a view is plainly unsound.

Second, the probative value of Crothers's testimony was not substantial. As to relevance, the evidence tends to prove only one of the three issues on which it was offered by the prosecution, viz, that defendant killed the victim and did so intentionally. But it does *not* tend to prove that defendant's motive was robbery.[2] Nor does it tend to prove that defendant did not act in self-defense. Self-defense, of course, is not negated by the presence of intent to kill. Rather, it is precluded by the absence of the various objective and subjective circumstances that justify the killing—which include, for example, an honest and reasonable belief in the apparent peril and the need for defense (*People* v. *Sonier* (1952) 113 Cal.App.2d 277, 278 [248 P.2d 155]; see Pen. Code, §§ 197, subd. 3, 198). Neither defendant's alleged act nor his alleged statement had any bearing on the presence or absence of such circumstances.

Next, it is true that Crothers's testimony was indeed offered on issues that would ultimately prove to be material to the prosecution's case—to wit, intent to kill, robbery as motive, and lack of self-defense. But as explained above, the evidence had a tendency to prove only the first.

Finally, as to necessity, Crothers's testimony was in fact merely cumulative with respect to other evidence available to the prosecution to prove the same issues. On the question whether defendant killed the victim and in-

---

[2] The majority appear to suggest that Crothers's testimony tends to prove that defendant's motive may have been simply "to kill anyone who interfered with him or thwarted his desires or plans or, in other words, to kill on slight provocation under circumstances where he had no right of self-defense." (Maj. opn., *ante,* at p. 1015.) Whether or not the evidence does in fact have a tendency to prove such a point seems without consequence here. The prosecutor did not offer the evidence for that purpose.

tended to do so, the prosecution also had defendant's statement to Detective Correll that he killed the victim and intended to do so, but only in self-defense. Next, on the question whether defendant's motive was robbery—on which the testimony was *not* relevant—the prosecution also had evidence that defendant had taken the victim's belongings and apparently cleaned the crime scene of items that could have linked him to the incident.[3] Lastly, on the question whether defendant acted in self-defense—on which the testimony was *not* relevant—the prosecution also had, in the prosecutor's own words, "the placement of the wounds, in particular three wounds in close proximity behind the ear" and the fact that "the trigger pull on the weapon was greatly—was much greater than the normal trigger pull on a five-shot weapon." I recognize that the trial court determined that the evidence was "not merely cumulative" to other evidence. In view of the foregoing, that determination is plainly unsound.[4]

I now turn from the fact of error to its consequences. Of course, an erroneous evidentiary ruling such as that here requires reversal if it subjected the defendant to prejudice. (See, e.g., *People* v. *Anderson, supra,* 43 Cal.3d at p. 1137.) Generally, prejudice is not presumed but is determined after an examination of the entire cause. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Prejudice is found when "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" (*ibid.*)—or stated differently, when it is reasonably probable the error marginally contributed to the outcome. "A review of our cases reveals that 'reasonable probability' as here used . . . mean[s] . . . simply 'a probability sufficient to undermine confidence in the outcome' [citation]." (*People* v. *Bell* (1989) 49 Cal.3d 502, 559 [262 Cal.Rptr. 1, 778 P.2d 129] (dis. opn. of Mosk, J.).) To my mind, such a probability exists here.

As explained above, the testimony carried within itself potential for substantial prejudicial effect: it presented defendant as a man who was bad and as such unworthy of belief. That effect was magnified by the prosecutor's comments in summation. In his opening argument he quoted defendant's

---

[3] Contrary to the majority's apparent suggestion, on the question whether defendant's motive was to prevent the victim from interfering with him or thwarting his desires or plans—an issue not raised by the prosecutor (see fn. 2, *ante*)—the prosecution also had evidence including the firing of three bullets into the victim's head behind the left ear, which could support an inference defendant wanted to prevent the victim from interfering with him in life, and the taking of the victim's belongings and the apparent cleaning of the crime scene, which could support an inference defendant wanted to prevent the victim from interfering with him after death.

[4] The majority also consider Crothers's testimony "not 'merely cumulative.'" (Maj. opn., *ante,* at p. 1016.) For the reasons stated above, they too are incorrect.

alleged statement virtually verbatim: "We also know by a statement from Crothers that he is somewhat of a self-styled gangster. He made the comment to Crothers—'Why do you have that gun?' And he pointed the gun at Crothers and he said, 'Because'—these are his words, not mine, 'Because I will waste any mother fucker that screws with me.' He's bad, likes to think that he's a bad man, tough. That's the kind of defendant we have here." In his closing argument he again quoted the statement virtually verbatim: "A man who told us, or through the witness said, 'Why do you carry that gun,' and again his words: 'Because I will waste any mother fucker that screws with me.' [¶] Mr. Lang thinks he's bad, in colloquial words, bad meaning tough, tough hombre, little gangster. Nobody's going to mess with me. I'll waste them."

Defendant's credibility was crucial. He was the only eyewitness and the most important witness of any kind to testify for the defense. The question of credibility must be deemed to have been close. To be sure, defendant's testimony was not proof against challenge and his character for veracity was not sterling. But the tale he told was believable in itself and was presented in a believable manner. The closeness of the question is confirmed by the fact that although the case was simple and straightforward, the jury deliberated two full days and parts of two other days, and requested a rereading of defendant's testimony in its entirety. (See *People* v. *Woodard* (1979) 23 Cal.3d 329, 341 [152 Cal.Rptr. 536, 590 P.2d 391] [remarking that "The issue of guilt in this case was far from open and shut, as evidenced by the sharply conflicting evidence and the nearly six hours of deliberations by the jury before they reached a verdict."].)

On this record, the error under review is sufficient to undermine confidence in the outcome. Accordingly, I would reverse the judgment.

## II

The trial court also erred when it denied a motion defendant made under section 352 to bar the prosecution from impeaching him with certain felony convictions he had suffered in Oregon.

After the prosecution completed its case-in-chief but before the defense made its opening statement, defendant moved to preclude impeachment with convictions in Oregon for robbery in the second degree, escape in the second degree, and—impliedly—unauthorized use of a vehicle; he conceded he could properly be impeached with convictions in that state for burglary in the second degree and forgery in the first degree. The prosecutor opposed the motion. He relied on article I, section 28, subdivision (f), of the Califor-

nia Constitution (hereafter section 28(f)), which was adopted as part of Proposition 8 at the June 1982 Primary Election and declares in relevant part that "Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding."

The trial court denied defendant's motion: "There's some room for—there's a lot of room for discussion as to whether section 28f that was added to the California Constitution that provides any prior felony conviction of any person in any criminal proceeding whether adult or juvenile shall subsequently be used without limitation for purposes of an impeachment or enhancement in any criminal proceeding. [¶] There's some ambiguity possible in that, but I think the plain meaning of it is that a prior conviction can be used without limit for purposes of impeachment . . . . [¶] There was room for reasonable lawyers and judges to disagree, but to me it's clear." Taking the witness stand, defendant admitted the five convictions referred to above.

In *People* v. *Castro, supra,* 38 Cal.3d 301, this court held that "section 28 was not intended to abrogate the traditional and inherent power of the trial court to control the admission of evidence by the exercise of discretion to exclude marginally relevant but prejudicial matter—as, indeed, is provided by Evidence Code section 352." (*Id.* at p. 306.) A plurality of the *Castro* court concluded that under subdivision (f) of the constitutional provision the trial court may admit evidence of a felony conviction to impeach the credibility of a witness if and only if the least adjudicated elements of the underlying felony necessarily involve moral turpitude, i.e., the readiness to do evil. (*Id.* at pp. 313-317.) The plurality emphasized that admission of a felony conviction that is not inadmissible as a matter of law under the foregoing rule is always subject to the trial court's discretion under section 352. (*Id.* at p. 306.)

In *People* v. *Collins* (1986) 42 Cal.3d 378 [228 Cal.Rptr. 899, 722 P.2d 173], this court prescribed "the procedure to be followed by appellate courts in applying *Castro* to cases tried before the date of that decision and still pending before them. The issue is presented in each case in which (1) the defendant was charged with a crime committed on or after June 9, 1982, [the date on which Proposition 8 became effective,] (2) the prosecution proposed to impeach the defendant with proof of one or more prior felony convictions if he testified, (3) the defendant moved for an order excluding those convictions in the exercise of the trial court's discretion under section 352, and (4) the court denied the motion without exercising its discretion

because it deemed itself bound to admit the convictions by section 28(f)." (*Id.* at p. 389, fns. omitted.)

"The appellate court should first decide whether the prior convictions are (1) admissible or excludable in the trial court's discretion or (2) inadmissible as a matter of law." (*People* v. *Collins, supra,* 42 Cal.3d at p. 389.) A prior conviction falls into the latter category when, as pertinent here, "it does not necessarily involve moral turpitude." (*Ibid.*) "In most instances, accordingly, the appellate court will hold that the trial court committed *Castro* error in failing to exercise its discretion to admit or exclude the challenged prior convictions [citation], and/or in admitting convictions that are inadmissible as a matter of law [citation]." (*Id.* at p. 390.)

When, as here, the defendant testified after the trial court's adverse ruling, "the appellate court should make a preliminary determination of the probable effect of the prior convictions, taken together, on the outcome of the trial." (*People* v. *Collins, supra,* 42 Cal.3d at p. 390.) If it concludes "it is reasonably probable that a result more favorable to the defendant would *not* have been reached in the absence of the *Castro* error—i.e., that the admission of the prior convictions did not change the outcome—it should hold the error harmless. In all other cases the question of prejudice turns on whether the trial court would have admitted or excluded the prior convictions over which it had discretion. In such cases, however, the appellate court should not speculate on how the trial court would have exercised its discretion. Rather, it should reverse the judgment for the limited purpose of remanding the cause to the trial court with directions to exercise its discretion in the matter." (*Id.* at p. 391, fn. omitted & italics in original.)

I turn now to the case at bar. It is evident that *Castro* applies here and that the *Collins* procedure must be followed. The crimes with which defendant was charged were committed after June 9, 1982; the prosecution proposed to impeach him with his felony convictions if he testified; defendant moved the trial court to bar impeachment in the exercise of its discretion under section 352; and the court denied the motion without exercising its discretion expressly because it deemed itself bound to admit the convictions by section 28(f).

Following the *Collins* procedure here, I believe that the trial court committed *Castro* error when it denied defendant's section 352 motion to bar impeachment with his convictions for robbery in the second degree, escape in the second degree, and unauthorized use of a vehicle.

First, by ruling as it did the trial court allowed introduction for impeachment of the convictions for escape in the second degree and unauthorized use of a vehicle—convictions that were inadmissible as a matter of law.

The least adjudicated elements of escape in the second degree consist of the unauthorized departure from custody. These elements simply do not *necessarily* involve moral turpitude, i.e., the readiness to do evil. Rather, the most they *necessarily* involve is disrespect for authority. In *United States* v. *Zimmerman* (E.D.Pa. 1947) 71 F.Supp. 534, the court stated with regard to a similar offense under a similar law: "I cannot say that the action of an escaping prisoner involves that element of baseness, vileness or depravity which has been regarded as necessarily inherent in the concept of moral turpitude. On the contrary such action, while mistaken and wrong under these circumstances, does undoubtedly spring from the basic desire of the human being for liberty of action and freedom from restraint." (*Id.* at p. 538.)[5]

The least adjudicated elements of unauthorized use of a vehicle consist of merely the unauthorized use of a vehicle. These elements certainly do not *necessarily* involve moral turpitude. Rather, the most they *necessarily* involve is the culpability of a "joyrider."

Second, by ruling as it did the trial court failed to exercise its discretion to allow or bar introduction for impeachment of the conviction for robbery in the second degree—which is plainly a crime of moral turpitude and hence not inadmissible as a matter of law. As shown above, the failure is manifest on the face of the record.

In this case, the *Castro* error was prejudicial—and would have been so even if the prior robbery conviction was the sole impeaching offense. That is to say, an appellate court cannot properly conclude "it is reasonably probable that a result more favorable to the defendant would *not* have been reached in the absence of the *Castro* error—i.e., that the admission of the

---

[5] In concluding that the least adjudicated elements of the felony of escape in the second degree in violation of Oregon Revised Statutes section 162.155 necessarily involve moral turpitude, the majority reason: "Escape without force, as defined by both Oregon and California law, necessarily involves some form of stealth, deceit, or breach of trust, and the potential for violence is always present when an escaped felon is recaptured." (Maj. opn., *ante,* at p. 1010.) It is immaterial, however, what escape without force as defined by *California* law necessarily involves: defendant was convicted of violating *Oregon* law. And as shown above, Oregon law "necessarily involves" at most disrespect for authority. It is of no consequence here whether "the potential for violence is always present when an escaped felon is recaptured." Such a "potential" is not a part of the *actus reus,* nor is awareness (actual or constructive) of this "potential" an aspect of the mens rea.

prior convictions did not change the outcome . . . ." (*People v. Collins, supra,* 42 Cal.3d at p. 391, italics in original.)

The determination of the first degree murder and robbery charges and the related allegations depended on the resolution of a single crucial question: When did defendant form the intent to steal the victim's possessions, before the killing or after? This issue was, of course, critical as to robbery. (See *People v. Green* (1980) 27 Cal.3d 1, 54 [164 Cal.Rptr. 1, 609 P.2d 468] [holding that "if the larcenous purpose does not arise until after the force has been used against the victim, there is no 'joint operation of act and intent' necessary to constitute robbery"].) The "timing" issue was also critical to first degree murder. The evidence supported guilt on a theory of felony-murder-robbery but not willful, deliberate, and premeditated murder. The prosecutor conceded as much in his opening argument in summation: "Now, in terms of the straight murder in the first degree as opposed to felony murder . . . . Quite frankly the People submit that the evidence doesn't support that particular kind of murder. The murder we have here is a felony murder because the murder was committed during the commission of the robbery . . . ." Lastly, it follows that the "timing" issue was critical as to the allegations of the use of a firearm in the murder, the use of a firearm in the robbery, and the felony-murder-robbery special circumstance.

Further, the resolution of the single crucial question when did defendant form the intent to steal depended, in turn, on a determination of his credibility as a witness. The circumstantial evidence bearing on the "timing" issue was ambiguous at best and of little substance. There was, however, direct evidence relevant to the issue. But that evidence was defendant's testimony and defendant's testimony alone, which included a statement that he formed the intent to steal only after the killing.

Finally, as noted above (see Part I, *ante*), the determination of defendant's credibility as a witness must be deemed to have been close. To be sure, his testimony on when he formed the intent to steal—as on other matters—was not immune from attack. But the tale he told, especially on the "timing" issue, was believable in itself and was presented in a believable manner. The closeness of the question of credibility is confirmed by the fact that although the case was simple and straightforward, the jury deliberated two full days and parts of two other days, and requested a rereading of defendant's testimony in its entirety.

In such circumstances, impeachment with a prior robbery conviction cannot easily be held to be without significant effect. "To allow evidence of a prior conviction of the very crime for which a defendant is on trial may be

devastating in its potential impact on a jury. . . . [W]here, as here, the prior conviction is sufficiently similar to the crime charged, there is a substantial risk that all exculpatory evidence will be overwhelmed by a jury's fixation on the human tendency to draw a conclusion which is impermissible in law: because he did it before, he must have done it again." (*United States* v. *Bagley* (9th Cir. 1985) 772 F.2d 482, 488; accord, *People* v. *Beagle* (1972) 6 Cal.3d 441, 453 [99 Cal.Rptr. 313, 492 P.2d 1].)

I recognize that the trial court instructed the jury that it could consider the prior convictions only for credibility. But "To tell a jury to ignore the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities. In such cases, it becomes particularly unrealistic to expect effective execution of the 'mental gymnastic' required by limiting instructions, [citation], and 'the naive assumption that prejudicial effects can be overcome by instructions to jury' becomes more clearly than ever 'unmitigated fiction,' [citation] . . . . [O]nce evidence of prior crimes reaches the jury, 'it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence. A drop of ink cannot be removed from a glass of milk.' " (*United States* v. *Daniels* (D.C. Cir. 1985) 770 F.2d 1111, 1118.)

For the reasons stated above, I would vacate the judgment as to the convictions for first degree murder and robbery and as to the findings on the use of a firearm in the murder, the use of a firearm in the robbery, and the special circumstance of felony-murder-robbery, and would remand the cause to the trial court with directions to exercise its discretion on the admissibility of the convictions in question. (See *People* v. *Collins, supra,* 42 Cal.3d at p. 391.)

### III

The trial court committed yet another error when it instructed the jurors, in accordance with a modified version of a standard instruction (CALJIC No. 2.15 (4th ed. 1979)), as follows: "The mere fact that a person was in conscious possession of recently stolen property is not enough to justify his conviction of the crime charged in [Count 2 of] the information [i.e., robbery]. It is, however, a circumstance to be considered in connection with other evidence. To warrant a finding of guilty, there must be proof of other conduct or circumstances tending of themselves to establish guilt. [¶] [In this connection you may consider the defendant's false or contradictory statements, if any, and any other statements he may have made with reference to the property. If a person gives a false account of how he acquired possession of stolen property this is a circumstance that may tend to show

guilt.]" (All brackets and bracketed material original except "[i.e., robbery]."[6]

"In deciding whether an instruction is erroneous, we ascertain at the threshold what the relevant law provides. We next determine what meaning the charge conveys in this regard. Here the question is, how would a reasonable juror understand the instruction. . . . Finally, we determine whether the instruction, so understood, states the applicable law correctly." (*People v. Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218].)

When the instruction in question is reviewed thus, it is found to be erroneous. The law is that a juror may infer that a person who gives a false account of how he acquired stolen property may have acquired it improperly. The instruction, however, would have been understood by a reasonable juror to mean that he might infer that a person who gave a false account of how he acquired stolen property might have acquired it through *robbery rather than theft*.

Certainly, this is how the prosecutor understood the instruction and how he urged the jurors to understand it. During his opening argument in summation, he said: "You'll be given an instruction that possession of stolen property by a defendant in and of itself is not proof of the defendant's guilt, but evasive or deceptive explanation as to how he acquired the property may be considered by you as showing a consciousness of guilt. [¶] How does that apply. Well, if you recall the statements that he made . . . what he was doing with the motor home, how he got it, his use of the credit cards: 'I have taken care of it. Yes, I can use these credit cards.' [¶] *All these explanations were clearly lies, but they show a consciousness of guilt in the mind of this defendant as to how he acquired that property. Not through panic. Not through inadvertence, not an afterthought, but he intended to take that property and in fact did, and killed the defendant in the—the victim in the process.*" (Italics added.)

Therefore, the instruction, as it would have been understood by a reasonable juror, does not state the law correctly: it did not simply permit the jurors to draw the reasonable inference of improper acquisition from false account, but actually permitted them to draw an unreasonable inference that the improper acquisition was effected through robbery rather than theft.[7]

---

[6] I quote the instruction as it appears on the written form sent into the jury room for deliberations and recorded in the clerk's transcript, and not the instruction as it was orally delivered and recorded in the reporter's transcript. The versions, however, are virtually identical and differ in no way relevant here.

[7] In concluding that the instruction was not erroneous, the majority first appear to reason that the instruction did *not* in fact permit the jurors to draw an inference that defendant was

The error requires reversal. As explained above, the issue whether defendant committed robbery or grand theft was critical not only to the conviction for robbery: it was crucial as well to the conviction for first degree murder under a theory of felony murder—clearly the only theory sufficiently supported by the evidence—and the findings on the use of a firearm in the murder, the use of a firearm in the robbery, and the special circumstance of felony-murder-robbery. As also explained above, the issue was as close as it was critical: the circumstantial evidence did not point unmistakably in either direction; the direct evidence—defendant's testimony—did, but was not immune from attack. The erroneous instruction, which was emphasized by the prosecutor in his summation, permitted the jurors to speculate that the improper acquisition of the victim's belongings was effected through robbery rather than theft. Thus, the instruction skewed the resolution of this critical issue to defendant's prejudice and hence is sufficient to undermine confidence in the outcome. Accordingly, I would reverse the judgment.

## IV

Defense counsel's failure to present certain available evidence in mitigation at the penalty phase resulted in a verdict of death that does not satisfy the heightened degree of reliability required by the Eighth Amendment to the United States Constitution and article I, section 17, of the California Constitution.

At the penalty phase, the prosecution's case consisted of a stipulation covering defendant's prior felony convictions. The defense's case consisted of the testimony of a correctional officer. The officer testified that defendant had not presented any disciplinary problems while in custody before and during trial. After deliberating about three full days over a period of four days, the jury returned a verdict of death.

At the sentencing hearing, defense counsel stated for the record that he had intended to call defendant's elderly grandmother as a witness at the penalty phase to present defendant's "history." That "history" would evidently have been substantially as follows. Defendant was born in 1960. Three years later his parents divorced; his mother did not seem interested in

---

guilty of robbery rather than grand theft from his false accounts of how he acquired possession of the victim's belongings. But as shown above, such a conclusion is unsound. The majority then appear to reason that even if it did permit the jurors to draw that inference it was not objectionable in that regard "Defendant's conduct . . . supports an inference that he committed the greater crime because the more serious the offense, the stronger the motive for concealment of the true facts." (Maj. opn., *ante,* at pp. 1024-1025.) I disagree. Defendant's conduct certainly allows *speculation* that he may have committed robbery rather than grand theft. But to my mind it does not permit a reasonable inference that he actually did so.

him, and he was taken into his father's home. Over the following years he resided mainly with his father. His father remarried when defendant was five years old, divorced when he was twelve, and remarried again when he was thirteen; his mother remarried and divorced four times. Defendant was a sensitive child, bashful, quiet, good with other children in school, and of a nonviolent disposition, but lonely and solitary; he apparently felt neglected or rejected by his parents and stepparents—and especially by his father. Although he resided mainly with his father during these years he apparently lived on and off with his grandmother because of troubles in his father's home. In his teenage years he began to get into trouble—usually by stealing items from his father in order to "get even." At 15 he left his father's home and began to fend for himself. In his late teenage years he became involved in more serious criminal activity—which culminated in the present offenses.

Defense counsel, however, did not call defendant's grandmother. He explained: "I wanted to present a great deal more history about Mr. Lang's life, because I think it is important. . . . [¶] So I wanted to bring her here to have the jury hear that—and I think, to his great sorrow, in terms of the result, but I think to his credit as a human being—Ken Lang did not want to put his elderly grandmother through that kind of experience of the emotional trauma of having to come here and testify. And I think part of his mind set was even to go through the taint of being associated with this whole process of the serious offense of which he stood convicted."

In *People* v. *Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925], this court reversed a judgment of death on the ground that defense counsel's failure to present evidence in mitigation—although in accord with his client's wishes—rendered the penalty determination constitutionally unreliable.

"First, the [*Deere*] court determined that counsel's failure to present evidence in mitigation introduced error into the penalty proceeding.

" 'To permit a defendant convicted of a potentially capital crime to bar his counsel from introducing mitigating evidence at the penalty phase . . . would . . . prevent this court from discharging its constitutional and statutory duty to review a judgment of death upon the complete record of the case, because a significant portion of the evidence of the appropriateness of the penalty would be missing.

" 'This deficiency of the record implicates another paramount concern of the state: "in capital cases . . . the state has a strong interest in reducing the risk of mistaken judgments." . . . Since 1976 the United States Supreme Court has repeatedly recognized that the qualitative difference between

death and all other penalties demands a correspondingly higher degree of reliability in the determination that death is the appropriate punishment. (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (plur. opn.).) And since 1978 the high court has insisted that the sentencer must be permitted to consider any aspect of the defendant's character and record as an independently mitigating factor. (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 604-605 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954] (plur. opn. of Burger, C. J.).)

" 'To allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant was himself prevented from introducing such evidence by statute or judicial ruling. In either case the state's interest in a reliable penalty determination is defeated.' (41 Cal.3d at pp. 363-364.)

"Next, the [*Deere*] court determined that so long as 'the record . . . demonstrates "the possibility that at least *someone* might have been called to testify on defendant's behalf and to urge that his life be spared" ' " (41 Cal.3d at p. 367, italics in original), the error introduced into the penalty proceeding by counsel's failure to present evidence in mitigation cannot be deemed harmless. The court explained: " 'When the sentencer in a capital case is deprived of all or a substantial part of the available evidence in mitigation, "the potential for prejudice is too obvious to require proof." [Citation.] Indeed, "short of substituting a verdict of its own, there is no way for a reviewing court to determine what effect unpresented mitigating evidence might have had on the sentencer's decision." [Citation.] We have no doubt that a judgment of death imposed in such circumstances constitutes a miscarriage of justice (Cal. Const., art. VI, § 13): not only did defendant not have a fair penalty trial—in effect he had no penalty trial at all.' (41 Cal.3d at p. 368.)" (*People* v. *Williams* (1988) 44 Cal.3d 1127, 1158-1159 [245 Cal.Rptr. 635, 751 P.2d 901] (conc. & dis. opn. of Mosk, J.).)

I turn now to the case at bar. On the face of the record it is plain that *Deere* error occurred: at defendant's request counsel declined to present available evidence in mitigation—evidence that counsel would otherwise have presented.

It is also plain that the error here cannot be deemed harmless. As in *Deere,* "the record . . . demonstrates 'the possibility that at least *someone* might have been called to testify on defendant's behalf and to urge that his life be spared.' " (41 Cal.3d at p. 367, italics in original.) Indeed, the record demonstrates the virtual certainty that defendant's grandmother would have been called. As also in *Deere,* " '. . . there is no way for a reviewing

court to determine what effect unpresented mitigating evidence might have had on the sentencer's decision[,]' " and no need for it to do so since " 'the potential for prejudice is too obvious to require proof.' " (*Id.* at p. 368.) But in this case I think a court could make a reasonable conjecture that defendant's grandmother's testimony would have tipped the scales on which penalty was weighed in his favor. With virtually no mitigating evidence, the balance must have been close to equipoise: as noted above, the jury deliberated about three full days before it chose death. With defendant's grandmother's testimony, I believe the balance would have verged toward life.

Accordingly, I would set aside the verdict of death as constitutionally unreliable and would reverse the judgment as to penalty. (See *People* v. *Deere, supra,* 41 Cal.3d at p. 368.)[8]

V

The trial court also committed error under *People* v. *Brown, supra,* 40 Cal.3d 512, by instructing the jurors in accordance with the mandatory-penalty-determination language of Penal Code section 190.3 (hereafter section 190.3) as that language was incorporated in a modified version of a standard instruction (CALJIC No. 8.84.2 (4th ed. 1979)): "If you agree unanimously and beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, *you shall impose a sentence of death . . . .*" (Italics added.) The final paragraph of section 190.3, on which the foregoing instruction was based, declares: *"the trier of fact . . . shall impose a sentence of death* if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances." (Italics added.)

In *Brown* this court construed the final paragraph of section 190.3 as follows in order to avoid the serious Eighth Amendment questions that

---

[8] In finding no prejudicial error, the majority appear to rely on the proposition that "the reliability required by the Eighth Amendment in death penalty cases 'is attained when' "—as here, in the majority's view—" 'the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present.' " (Maj. opn., *ante,* at p. 1030, quoting *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1228 [259 Cal.Rptr. 669, 774 P.2d 698].) To my mind, that proposition is unsound. Reliability can be assured only when the record on which the verdict is based is "complete," i.e., when it does not lack any "significant portion of the evidence of the appropriateness of the penalty" that counsel reasonably concludes " '. . . makes the most compelling case in mitigation.' " (*People* v. *Deere, supra,* 41 Cal.3d at pp. 363, 364, fn. 3.) It is obvious that the record here is not "complete" in that sense. Certainly, the testimony of the correctional officer could not reasonably have been judged by counsel to make the most compelling case in mitigation—nor was it actually judged by him to have such an effect. Indeed, the officer's testimony made virtually no case in mitigation at all.

would arise if the trier of fact were deprived of discretion to decline to fix the penalty at death. "In this context, the word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider . . . . By directing that the jury 'shall' impose the death penalty if it finds that aggravating factors 'outweigh' mitigating, the statute should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances. Thus the jury, by weighing the various factors, simply determines under the relevant evidence which penalty is appropriate in the particular case." (40 Cal.3d at p. 541, fn. omitted.)

Stated simply, the trier of fact is "require[d] . . . to make a moral assessment on the basis of the character of the individual defendant and the circumstances of the crime and thereby decide which penalty is appropriate in the particular case." (*People* v. *Bonin* (1989) 47 Cal.3d 808, 856 [254 Cal.Rptr. 298, 765 P.2d 460].) In other words, "The jury is not simply to determine whether aggravating factors outweigh mitigating factors and then impose the death penalty as a result of that determination, but rather it is to determine, after consideration of the relevant factors, whether under all the circumstances 'death is the appropriate penalty' for the defendant before it." (*People* v. *Myers* (1987) 43 Cal.3d 250, 276 [233 Cal.Rptr. 264, 729 P.2d 698] (lead opn. by Grodin, J.).)[9]

---

[9] There is language in *People* v. *Hendricks* (1988) 44 Cal.3d 635, 654 [244 Cal.Rptr. 181, 749 P.2d 836], that may perhaps be read to stand for the proposition that the trier of fact's discretion to decline to fix the penalty at death may be limited without offense to the Constitution—as by requiring the trier to choose death if it determines that aggravating circumstances outweigh mitigating circumstances. Such a reading, however, should be avoided as constitutionally erroneous.

In *McCleskey* v. *Kemp* (1987) 481 U.S. 279 [95 L.Ed.2d 262, 107 S.Ct. 1756], the United States Supreme Court stated that "In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence. '[T]he sentencer . . . [cannot] be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" (*Id.* at p. 304 [95 L.Ed.2d at p. 286], italics in original.)

With these words, the *McCleskey* court declared expressly that—at least in the general capital case—the Constitution prohibits a state from denying the sentencer discretion *to consider evidence that might support a penalty other than death*. It also declared impliedly that the Constitution prohibits a state from denying the sentencer discretion *actually to choose such a penalty*.

Although in *Brown* this court upheld the constitutionality of the final paragraph of section 190.3, it nevertheless recognized that when delivered in an instruction that provision's mandatory-penalty-determination language might mislead jurors as to the scope of their sentencing discretion, to the defendant's prejudice, in violation of Eighth Amendment principles. (40 Cal.3d at p. 544, fn. 17.) Specifically, a juror might reasonably understand that language to define the penalty determination as "simply a finding of facts" (*id.* at p. 540) or "a mere mechanical counting of factors on each side of the imaginary 'scale'" (*id.* at p. 541). In other words, he might be misled as to the nature of the process by which penalty is determined. A juror might also reasonably understand the language to require him to vote for death if he finds that the evidence in aggravation outweighs the evidence in mitigation—even if he determines that death is not the appropriate penalty under all the circumstances. (See *id.* at pp. 540-544.) That is to say, he might be misled as to the character of the ultimate question to be resolved in the process of determining penalty.

In this case, the trial court's instruction on the determination of penalty might indeed have misled the jurors as to the scope of their sentencing discretion, to defendant's prejudice, in violation of Eighth Amendment principles. Review of the record discloses the following.

To begin with, the trial court instructed the jurors in accordance with the mandatory-penalty-determination language of the final paragraph of section 190.3 without material modification. The statutory provision declares, "the trier of fact . . . *shall* impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances." (Italics added.) The instruction states, "If you agree unanimously and beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, you *shall* impose a sentence of death . . . ." (Italics added.) The presence in the instruction of the requirement of unanimous agreement beyond a reasonable doubt, of course, does not neutralize or ameliorate the objectionable mandatory-penalty-determination language. It merely establishes the point at which the "mandate" becomes operative.[10]

Moreover, in anticipation of the trial court's instruction, the prosecutor in his summation emphasized, and misleadingly explicated, the mandatory-penalty-determination language time and again. In words that do not quite fill 10 pages of the reporter's transcript, the prosecutor quoted, paraphrased, or alluded to, the objectionable language no fewer than 10 times.

---

[10] Contrary to the majority's suggestion, the mandatory-penalty-determination language is not neutralized or ameliorated by an instruction that the jurors could consider sympathy for defendant: such an instruction plainly has no effect whatever on the "mandate."

Near the beginning of his argument, the prosecutor stated: "So you have taken an oath to follow the law, and now you have a general idea of what that law is and what your duties are, even if it may disagree—even if it may rub against a personal belief that you might hold. You might have said at the beginning 'it would be very rare for me to impose the death penalty,' but you said you would follow the law. *If you find that the factors in aggravation outweigh the factors in mitigation, to uphold your oath and to follow the law, you must impose death.*" (Italics added.)

The prosecutor soon returned to the point: "As we said, *if the factors in aggravation outweigh, that means the death penalty must be imposed as a matter of law. If you find beyond a reasonable doubt the factors in aggravation outweigh, the death penalty must be imposed as a matter of law.*" (Italics added.)

The prosecutor returned to the point yet again: "Now, you may say to yourself, 'This is an awfully difficult choice. Why can't the judges and the lawyers make this choice? It's hard for me to make this choice. I don't feel comfortable with it. *Yes, I know it's my duty that I find that these factors in aggravation far outweigh those in mitigation, and, therefore, the law says I must impose the penalty of death.*' But, you say, 'That's very difficult for me to do.'

"Well, it's a question of what your duty is and what your oath is. The system is designed in such a way that it is felt better for 12 members of the community, who reflect the values of this community, to decide what is an appropriate punishment in this most serious of cases. . . . Puts you to the test. Puts you to the test of your ability to follow the law and follow what you perceive to be your duty." (Italics added.)

Yet again the prosecutor returned to the point: "In this case, if you remember, you took an oath to follow the law. Perhaps, in the beginning when you took that oath, you felt you might not even come to this point, and so it was easy to say, 'Yes, I do. I will follow that oath. I will follow the law.' But now you find that you're put to the test. We all—. . . we all took oaths—lawyers took oaths as officers of the court. Witnesses took oaths. The judge took an oath to be a judge. You took oaths to be a juror, and we all have to follow that oath. And the duty is to follow the law, whether you agree with it or not.

"You decide how much weight to give those factors in aggravation—felony convictions, the circumstances of the crime—and how much weight to give those factors in mitigation—the effects of alcohol, perhaps; the age

of the defendant; sympathy for the defendant. You decide how much weight to give it.

"Do it objectively. Try not to let your personal feelings about the death penalty intrude, because as a matter of law you're not permitted to do that. You're not permitted to do that. You have to be objective about this. You assess and evaluate and give weight to each of the factors and decide where the scale goes.

"If the scale goes down on the side of aggravation, the law says there can be only one penalty. As difficult as that might be for you to accept, *if that is your decision, that the factors in aggravation beyond a reasonable doubt outweigh the factors in mitigation, the law says you have only one choice, the death penalty.* If, on the other hand, they become equal or mitigation outweighs, then, of course, life without the possibility of parole. But you have to set aside your own personal convictions about the death penalty, and you have to follow the law. It's not an easy choice for you to make, but, then, choices in this society aren't always easy." (Italics added.)

The prosecutor returned to the point a final time as he closed his argument: "In this case, you have to decide what your sense of duty is. You've taken an oath to follow the law, and as unpleasant as it might seem to you personally, if you judge that the factors in aggravation outweigh those factors in mitigation—'I worked it out any way I can, but every time I come back to it. The scales always tip in favor of aggravation.' You may not like that result. You may find yourself shocked that what you held as a feeling that you would not impose [the] death penalty unless it was the most heinous of crimes, and you would work out a scenario in your mind of multiple murders of nuns and children and sexual carnages. And if you find that you don't have that kind of case, the most heinous of cases, but you have a case *where, according to the law, the factors in aggravation outweigh and you must impose the death penalty*—not an easy choice to make.

"But you have a duty to follow the law, *and if that is your finding, that aggravation outweighs mitigation, you must impose the death penalty. You have no other choice*. To do otherwise upon such a finding would be not to be doing your job, to be violating your oath and letting the system down, in a sense.

"If you overlook the evidence and vote based on your heart and based on a sense of emotion, then you've not followed your oath, and you've done a disservice to the other jurors who sat here and tried to do their job.

"I ask that when you analyze these factors, simply try to be as objective as possible and to remove your personal feelings about the death penalty

from your deliberations and evaluate each of these factors on both sides and place them on that scale. *And if you find the scale drops, goes down on the side of aggravation, your duty, I'm afraid it is clear. You must impose the death penalty, even if you don't like it.* That's your duty, and you have a duty to follow the law, and I'm confident that you can." (Italics added.)

In arguing as he did, the prosecutor delivered the message, time and again, that the law required the jurors simply to determine whether aggravating circumstances outweighed mitigating circumstances and then fix the penalty as the mandatory-penalty-determination language directs. That message, of course, was erroneous. It incorrectly described the character of the ultimate question to be resolved in the process of determining penalty: "The jury is not simply to determine whether aggravating factors outweigh mitigating factors and then impose the death penalty as a result of that determination." (*People* v. *Myers, supra,* 43 Cal.3d at p. 276 (lead opn. by Grodin, J.); see, e.g., *People* v. *Bonin, supra,* 47 Cal.3d at p. 856; *People* v. *Brown, supra,* 40 Cal.3d at p. 541.) To my mind, a reasonable juror could not have ignored the prosecutor's words or their import. Certainly, the jurors in this case did not: during deliberations, they requested (but were denied) a rereading of the prosecutor's argument in its entirety.[11]

---

[11] In concluding that the prosecutor's argument would not have misled a reasonable juror as to the character of the ultimate question to be resolved in the process of determining penalty, the majority reason: "Although the prosecutor repeatedly urged the jury to follow the law if it determined that aggravating circumstances outweighed mitigating circumstances, those repeated urgings were offset by . . . repeated statements . . . regarding the jurors' discretionary control over the weighing process. . . . [W]hen jurors are told they can determine individually the weight to be assigned to the aggravating and mitigating circumstances, and can decide that one circumstance outweighs all others, they necessarily understand they have discretion to select the appropriate penalty. [Citation.] Also, the prosecutor on one occasion described the jury's penalty function expressly in terms of determining the appropriate penalty, stating: 'The system is designed in such a way that it is felt better for 12 members of the community, who reflect the values of the community, to decide what is an appropriate punishment in this most serious of cases.' " (Maj. opn., *ante,* at pp. 1034-1035.) I cannot agree.

In my view, the prosecutor's misleading comments on the character of the ultimate question to be resolved in the process of determining penalty were not "offset" by other assertedly correct remarks on the nature of that process. Certainly, in this case a reasonable juror would *not* have understood from the prosecutor's argument that he had discretion to select the appropriate penalty: on the contrary, he would have understood from that very argument that appropriateness was not his concern. Moreover, the prosecutor's remarks on the nature of the process of determining penalty doubtless did more harm than good. They may have adequately described the *form* of the discretion given to the jurors. But they offered a perverted view of its *substance.* Time and again they portrayed the nature of the penalty-determining process as impersonal: "Do it objectively. Try not to let your personal feelings about the death penalty intrude, because as a matter of law you're not permitted to do that. You're not permitted to do that. You have to be objective about this. You assess and evaluate and give weight to each of the factors and decide where the scale goes"; and, "I ask you when you analyze these factors, simply try to be as objective as possible and to remove your personal feelings about the death penalty from your deliberations." As explained above, the nature of the penalty-determining process is not such. It is a "moral assessment" (*People* v. *Bonin, supra,*

Finally, in his summation defense counsel said nothing that could have led a reasonable juror to believe that the mandatory-penalty-determination language in the instruction the trial court was about to deliver did not correctly state the applicable law. The gist of his argument, and the words with which it ended, was that "this is not a death penalty case." In his only allusion to the objectionable language, counsel urged that there was "much more than a reasonable doubt whether the aggravating circumstances outweigh the mitigating"—in fact, "mitigation outweighs aggravation." With these words, counsel suggested that it was indeed the law that if the aggravating circumstances outweighed the mitigating the penalty of death had to be imposed, but declared only that the condition was not satisfied.

For the reasons stated above, I would hold that the trial court's instruction in accordance with the mandatory-penalty-determination language of the final paragraph of section 190.3 might indeed have misled the jurors as to the scope of their sentencing discretion, to defendant's prejudice, in violation of Eighth Amendment principles. Therefore, I would set aside the verdict of death and reverse the judgment as to penalty. (See, e.g., *People* v. *Farmer* (1989) 47 Cal.3d 888, 931 [254 Cal.Rptr. 508, 765 P.2d 940].)

## VI

Finally, the trial court committed error when it denied defendant's application for modification of the verdict of death under Penal Code section 190.4, subdivision (e) (hereafter section 190.4(e)), because its review was improperly limited.

After the jury returned the verdict of death, defendant made a verdict-modification application under section 190.4(e). The trial court denied the application, reasoning in substance that "the factors in aggravation outweigh those in mitigation beyond any reasonable doubt."

Section 190.4(e) provides in relevant part that in ruling on an application for modification of a verdict of death, "the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating

---

47 Cal.3d at p. 856), a profoundly and irreducibly personal determination as to whether the defendant should live or die.

Further, that the prosecutor uttered the phrase "appropriate punishment" is of no consequence. Manifestly, the words have no magical power, transforming misleading argument into proper exposition *ex opere operato*. Without such power they have no effect at all: a reasonable juror would have understood "appropriate penalty" to mean simply the penalty "mandated" by the "law."

circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented."

Section 190.4(e) "requires that the trial judge make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law." (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 793 [230 Cal.Rptr. 667, 726 P.2d 113]; accord, *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1252 [255 Cal.Rptr. 569, 767 P.2d 1047].) As explained above (see Part V, *ante*), the penalty is proper only if death is appropriate under all the circumstances—not merely if aggravation outweighs mitigation. Therefore, section 190.4(e) requires that the trial judge make an independent determination whether imposition of the death penalty is appropriate under all the circumstances, not simply whether aggravation outweighs mitigation.

The trial judge here did not make such a determination. I do not fault him for his error: he passed on defendant's application before the relevant law was clarified in such decisions as *People* v. *Brown, supra,* 40 Cal.3d 512, 538-544, and *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 792-794. But the fact remains, he did indeed err.[12]

Accordingly, I would vacate the judgment as to penalty and remand the cause to the trial judge for redetermination of defendant's application for modification of the verdict of death. (See *People* v. *Rodriguez, supra,* 42 Cal.3d at p. 794.)[13]

---

[12] In coming to the contrary conclusion, the majority reason that "the question whether aggravating circumstances outweigh mitigating circumstances cannot be separated from the determination of appropriateness for . . . the weighing of aggravating and mitigating circumstances *is the method* by which the jury determines which penalty is appropriate. [Citations.] Thus the trial judge's stated conclusion . . . also constitutes a conclusion that the jury's determination of appropriateness was supported by the weight of the evidence." (Maj. opn., *ante,* at p. 1045, italics in original.) I cannot agree. The majority's reasoning would be sound if the determination that aggravation outweighs mitigation logically entailed the determination that death is appropriate under all the circumstances. But as explained above, it does not: in choosing death in the first instance and in reviewing that choice on application for modification of the verdict, the jury and the trial judge respectively must consider whether that penalty is appropriate under all the circumstances, not simply whether aggravation outweighs mitigation. But because of the *Brown* error (see Part V, *ante*), I cannot conclude with the necessary confidence that the jury acted as it was required. And for the reasons stated above, I am compelled to conclude that the trial judge, in fact, did not.

[13] Because of the evident mischief that it threatens, I feel constrained to comment on a certain dictum that appears in the majority opinion.

In discussing defendant's claim that trial counsel provided ineffective assistance because he failed to present available evidence in mitigation, the majority state that "The invited-error doctrine operates . . . to estop a defendant from claiming ineffective assistance of counsel based on counsel's acts or omissions in conformance with the defendant's own requests." (Maj. opn., *ante,* at p. 1032.) I cannot agree. The doctrine covers *error by the trial court.* (See generally 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 301-304, pp. 313-316.) It does

## VII

For the foregoing reasons, except as to the setting aside of defendant's conviction for possession of a concealable firearm by a convicted felon, I dissent from the judgment of the court.

**BROUSSARD, J.,** Concurring and Dissenting.—I agree generally with the views expressed by Justice Mosk in his concurring and dissenting opinion.

Appellant's petition for a rehearing was denied February 1, 1990. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

not appear to apply to *deficient performance by counsel*. Nor should it be extended to do so. Otherwise, the most substantial claims of ineffective assistance, viz, those predicated on counsel's failure to exercise *independent* professional judgment, would be barred—surely an untenable result.